558 A.2d 446

**Robert Wayne FOWLER**

v.

**STATE of Maryland.**

**No. 1243, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

June 6, 1989.

518

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Thomas K. Clancy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore, Towson County, on the brief), for appellee.

Submitted before GARRITY, ALPERT and BLOOM, JJ.

GARRITY, Judge.

Robert Wayne Fowler, the appellant, was convicted by a Baltimore County jury of the first degree murder of Susan Sullivan. He was sentenced to life imprisonment without parole. In this appeal it is contended that the trial judge erred by:

1. Refusing to suppress the appellant's confession;
2. Refusing to suppress the evidence found in the search of the appellant's automobile;
3. Refusing to suppress the evidence found in the search of the appellant's apartment;
4. Refusing to give the jury a defense requested instruction; and
5. Imposing the sentence in an unconstitutional manner.

### Factual Background

About 10:30 on the morning of August 11, 1987, John Wortham went to visit his friends, Jack and Susan Sullivan. The Sullivans were brother and sister and both were in their twenties. They lived with their mother, Ann Sullivan, in a patio garden apartment on Lord Byron Lane in Baltimore

County. When Mr. Wortham approached the apartment he noticed that the patio door was ajar. He looked into the living room and saw Susan lying "face down in a pool of blood." Death, it was later determined, had been caused by fifty-eight stab wounds. Most of the wounds were to the head and face. A few of the wounds were to the hands and lower part of the body and were determined by the medical examiner to be "defensive" wounds.

The police began an immediate investigation. They quickly located James McGovern, age sixteen, who lived across the road from the Sullivan apartment. McGovern told the police that he had been up late the prior evening watching television. Around 3 a.m. he heard a "high pitched" girl's voice and looked outside his window. Over the course of a few minutes he observed two men exit the Sullivan apartment through a window, one of whom was carrying a knife in a towel. The two men went to a car and tried to start it. Upon its failure, one of the men opened the hood, did something and started the engine. Although the description that McGovern gave of the man with the knife did not match the appellant's appearance, the general description of the second man did.

Further investigation led the police to Paula Bayne, who was a friend of Susan Sullivan. She had been with Susan the night before the homicide at Susan's apartment. She told the police that the appellant and his friend, Roger Blake, had also been with them at the apartment. Miss Bayne explained that she left the group in time to be at work at 10 p.m. At the time she left, she understood that Susan intended to go to a local night club with the appellant and his friend. Miss Bayne said she had never before met Roger Blake.

The police inspected the Sullivan apartment. The apartment was in disarray, but no property was stolen. Officer John Kilgor, one of the investigating officers, expressed the opinion that it looked as if there had been a violent struggle in the apartment.

The police also learned that the appellant owned a blue Duster automobile and that the Duster's ignition was broken. They located the car that evening and observed blood in it. They also procured a warrant to search the appellant's apartment. In the course of the search, which was conducted the next day, they found blood-soaked clothing.

Mrs. Sullivan and her son Jack were in Ocean City when Susan was murdered. When the police were able to talk with Mrs. Sullivan, she related further information which implicated the appellant. She explained that the appellant was a long-time friend of the family and was at their apartment on August 9, 1987. At that time she told the appellant that she and Jack were going to Ocean City and that Susan would be staying home alone. The appellant pressed Mrs. Sullivan for details of the trip and expressed particular interest in learning how long Susan would be in the apartment alone. As the appellant was more Jack's friend than Susan's, Mrs. Sullivan thought it was unusual for the appellant to show such interest in Susan.

## I. *Suppression of Statement*

Detective Philip Marll of the Baltimore County Police Department arrested the appellant at 9:25 on the morning of August 12, 1987 and took him to the Towson police station for questioning. Before he began the formal questioning, the detective conversed with the appellant and learned that he was twenty-one years old, had a seventh grade education, and could read and write. The detective then explained to the appellant the *Miranda*[1] rights. The appellant stated that he understood his rights and, in the detective's view, responded in a manner which suggested that the appellant, in fact, did understand his rights. When the detective asked the appellant if he wanted to talk about the murder, the appellant answered that "he had to."

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The police, of course, knew that two men had been seen leaving Miss Sullivan's apartment on the night of the murder. At the time of the appellant's arrest, they did not have any idea who the second man was, but they were anxious to learn his identity. Consequently, when Detective Marll began his questioning, he told the appellant that the police wanted to know who the second man was. The testimony presented at the suppression hearing was unclear as to how this subject was raised or exactly what was said. Nevertheless, at some time during the early part of the interrogation, Detective Marll advised the appellant that he should disclose the other man's name because if he did, "the weight could be shared."

As the appellant chose not to testify, there is no evidence of how he interpreted the comment. In any event, Detective Marll explained that he had not intended the comment as an inducement, but that he meant only to convey the idea that if the police could learn the second man's identify, the second man would also be charged.

After the preliminaries were completed, the appellant spoke with the detective for about two hours, during which time he orally confessed to the crime. Detective Marll testified that during the interrogation, the appellant was "calm and collected" and wanted to talk about the crime. Although the appellant confessed to the crime, he did not disclose the name of the second man. After the appellant completed his oral statement, he agreed to give a written statement. Before doing so, however, Detective Marll re-explained the Miranda rights and had the appellant sign a written waiver of those rights. The appellant then dictated his written statement. Although it had taken about two hours for the oral statement, the written statement was completed in less than ten minutes. In the course of giving the written statement, the appellant related that the other man who had been with him was Roger Blake.

The appellant argues that Detective Marll's statement about "sharing the weight" was an inducement because it

suggested that the police would give him some benefit in exchange for his information.

A defendant's confession is admissible into evidence only if it is "the product of a free and unconstrained will and [is] not extracted by any sort of threat or violence or obtained by direct or psychological coercion." *Hines v. State,* 58 Md.App. 637, 658, 473 A.2d 1335 (1984). The Court of Appeals in *Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415 (1979), explained that

> if an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

There is no dispute in this case about whether Detective Marll made the statement to the appellant about "sharing the weight." Both parties agree, and the trial judge found, that the comment was made. There is a dispute, however, as to the effect which the comment had upon the appellant. The trial judge concluded that the comment had no coercive effect upon the appellant because his statement was not made in reliance upon the detective's comment. He reached this conclusion because the comment was made only once; that the appellant was, on several occasions, fully advised of his rights and waived them; the conditions under which the interview was conducted were not coercive; the appellant was totally cooperative; and the appellant had expressed a desire to talk about the incident.

We are now called upon to decide whether the trial judge's ruling was correct. In making this determination we are required to make an independent, reflective constitutional judgment based on the facts presented at the suppression hearing. *Trusty v. State,* 308 Md. 658, 670, 521 A.2d 749 (1987). We are required to give great weight to the hearing judge's first-level facts, but "we must make our own independent judgment as to what to make of those

facts; we must, in making that independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or nonexistence of voluntariness." *Walker v. State*, 12 Md.App. 684, 695, 280 A.2d 260 (1971).

■ There is no direct evidence in the record that Detective Marll coerced the appellant. All that we have is speculation. The appellant speculates that he could have inferred from the comment that he would be rewarded for disclosing his confederate's name and as a consequence was induced into giving the statement. We think it significant that after the alleged inducement had been made, the appellant spoke with the detective for two hours. During this time he fully confessed to the crime, but never gave the detective the confederate's name. If the appellant had thought that he should confess because he was going to gain some benefit by disclosing his confederate's name, we expect he would have disclosed the name while giving the oral statement. Indeed, if the appellant were to be rewarded for disclosing the confederate's name, he could not expect to receive such reward until he disclosed the name. The fact that the appellant deferred in giving Mr. Blake's name until he had dictated the written statement convinces us that the detective's comment did not have a coercive effect upon the appellant and that the trial judge's ruling to that effect was correct.

## II. *Search of Automobile*

The appellant asseverates that the police conducted an improper search and seizure of his automobile because the police failed to secure a warrant. We shall examine the circumstances leading to the search and seizure of the car.

Officers John Kilgor and Edward Henry began the investigation of the murder at Miss Sullivan's apartment. They met James McGovern and he related his observations as previously detailed. The police also spoke with Jack Sullivan. He advised them that the appellant was one of his friends and that the appellant had owned a blue Duster

which matched the description of the car James McGovern had seen. Sullivan further related that the appellant's car had a broken ignition and that the appellant sometimes started it from under the hood.

The Sullivan apartment was in disarray. After inspecting it the officers formed the opinion that a "fierce struggle" had taken place there, but that the apartment had not been ransacked. The fingerprint expert found two of the appellant's fingerprints on an ash tray in the living room.

During the time the two officers were at the apartment investigating, the appellant approached and began talking about the incident. To the policemen's knowledge, the fact that Miss Sullivan had been stabbed to death had not been made public. Nevertheless, the appellant, for no apparent reason, asked: "How many times was she stabbed?"

Finally, the officers checked the motor vehicle records for information about the appellant. They learned his address and they also learned that he owned a blue Duster. Around 9:30 p.m., Detective Henry and Officer Kilgor went to the location of the appellant's apartment and observed that the appellant's car matched the description McGovern had given. The car was parked near the appellant's residence, "faced into a parking stall." It was dark, but the car's windows were open. The officers were able to inspect the interior of the car by using a flashlight.[2] Inside the car they observed a screwdriver and blood stains on both the front and rear seats. They also noticed that the ignition was missing and some "wires were hanging out." No further search was conducted at that time, but the officers remained with the car throughout the night. Officer Kilgor

---

**2.** The act of peering through the window did not constitute, in the constitutional sense, a search. This is because a search occurs only when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Society does not consider the interior of an automobile parked in a public place to be a place where a person has a reasonable expectation of privacy. *Scales v. State*, 13 Md.App. 474, 477–78, 284 A.2d 45 (1971), and *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

explained that he and Officer Henry were armed and that they intended to prevent anyone from moving or interfering with the car.

During the evening, two other police officers prepared an affidavit setting forth the facts of the case, as they were then known, for the purpose of procuring a warrant to search the appellant's apartment. The affidavit contained the information Officers Kilgor and Henry had learned about the appellant's automobile, but the application did not request a warrant to authorize the search or seizure of the automobile. Pursuant to the application, a warrant was issued that night authorizing a search of the appellant's apartment. Around 8 a.m. the next morning, other police officers arrived at the appellant's apartment with the search warrant. The police also brought a tow truck. At that time, the appellant's apartment was searched and his car was towed to a police lot. No warrant was ever issued to authorize the search or seizure of the car.

■ There is no question that after the police looked in the appellant's car they possessed probable cause to believe that the vehicle contained evidence of a crime. Also, since the appellant was still at large and the Duster was mobile, exigency existed. Thus, at that time the police possessed the authority under the *Carroll* doctrine to search and seize the car. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Malcolm v. State,* 70 Md.App. 426, 430, 521 A.2d 796 (1987), *affirmed,* 314 Md. 221, 550 A.2d 670 (1988); *Barrow v. State,* 59 Md.App. 169, 180, 474 A.2d 967 *cert. denied,* 301 Md. 41, 481 A.2d 801 (1984).

In *Barrow,* we explained that:

A motor vehicle may be searched without a warrant where police have "probable cause in the constitutional context to believe that the vehicle contains the fruits, instrumentalities, or other evidence of crime." *Mobley and King v. State,* 270 Md. 76, 80 [310 A.2d 803] (1973) (and cases cited therein), *cert. denied,* 416 U.S. 975 [94 S.Ct. 2003, 40 L.Ed.2d 564] (1974). This exception to the

Fourth Amendment warrant requirement is justified because the exigent circumstances caused by the inherent movability of a motor vehicle makes the obtaining of a warrant impracticable. *Id.* at 80–81 [310 A.2d 803] *(citing Coolidge v. New Hampshire,* 403 U.S. 443, 459–60 [91 S.Ct. 2022, 2034, 29 L.Ed.2d 564] (1971); *Carroll v. United States,* 267 U.S. 132, 153 [45 S.Ct. 280, 285, 69 L.Ed. 543] (1925)). Probable cause exists for a warrantless automobile search when facts and circumstances known to police are such "as would warrant a man of reasonable caution [to believe] that the vehicle contained articles lawfully subject to seizure."

*Id.* at 180, 474 A.2d 967.

The appellant contends that because the police had the opportunity during the time Officers Kilgor and Henry were guarding his car to request a warrant for the car, but failed to do so, the trial judge should have suppressed the evidence which the police found in the car.

The difficulty with the appellant's argument is that the Supreme Court, in a series of cases, has consistently ruled that once the police are authorized to conduct a *Carroll* doctrine search and seizure, it is permissible for them to delay their search and it is not necessary to secure a warrant during the delay. In *United States v. Johns,* 469 U.S. 478, 484, 105 S.Ct. 881, 885, 83 L.Ed.2d 890 (1985), the Court said, of a search authorized by authority of the *Carroll* doctrine, that:

There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure. *Texas v. White,* 423 U.S. 67, 68 [96 S.Ct. 304, 305, 46 L.Ed.2d 209] (1975) (per curiam); *Chambers v. Maroney,* 399 U.S. 42, 52 [90 S.Ct. 1975, 1981, 26 L.Ed.2d 419] (1970). "[T]he justification to conduct such a warrantless search does not vanish once the car has been immobilized." *Michigan v. Thomas,* 458 U.S. 259, 261 [102 S.Ct. 3079, 3080–3081, 73 L.Ed.2d 750] (1982), *(per curiam ).* A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains

contraband, and there is no requirement of exigent circumstances to justify such a warrantless search. *Id.*, at 261–262 [102 S.Ct. at 3080–3081]; see also *Florida v. Meyers,* 466 U.S. 380 [104 S.Ct. 1852, 80 L.Ed.2d 381] (1984) *(per curiam ).*

*See also Colorado v. Bannister,* 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1 (1980).

We hold that the search and subsequent seizure of the appellant's automobile was legal.

## III. *Search Warrant*

█ The appellant argues that the evidence found in his apartment should have been suppressed on the theory that no probable cause existed to issue the search warrant. The Court of Appeals in *Doering v. State,* 313 Md. 384, 403, 545 A.2d 1281 (1984), explained that "probable cause is a nontechnical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction, but more evidence than that which would arouse ·a mere suspicion." (Citations omitted). This court observed in *Tamburello and Rose v. State,* 67 Md.App. 180, 506 A.2d 1202 (1986), that when we review a warrant to determine whether the issuing judge was correct in finding that the affidavit provided the requisite probable cause, "we are enjoined not to 'invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner.' "

The affidavit set forth the facts as we have summarized them. The appellant has no quarrel with the accuracy of the facts; his only quarrel is that the facts were inadequate to establish probable cause. In particular, he complains that because James McGovern, the young man who saw the two men leaving the Sullivan apartment at 3 a.m., could not positively identify the two men, probable cause was lacking. We discern no merit in this argument. Even though there was no eyewitness identification evidence, we believe a fair analysis of the other information gave the police probable

cause to believe that the appellant was involved in the crime.

## IV. *Instruction*

The appellant complains that the trial judge committed reversible error by refusing to give an instruction requested by defense counsel. During his closing instructions the trial judge told the jury that "to aid and abet in the commission of a crime the Defendant must be present when the crime is committed and must willfully participate with the intent to make the crime successful." The trial judge later elaborated on this instruction by explaining that "the mere presence of the Defendant at the time and place of the commission of a crime is not sufficient to prove that the Defendant aided and abetted."

Defense counsel did not object to these instructions, but did request the trial judge to further instruct the jury that "there was no criminal liability on the part of the Defendant when the crime was an independent product of another fellow." The trial judge declined to give this instruction and explained that he was not giving it because his aiding and abetting instruction had covered the point. The appellant argues that on authority of *Mumford v. State,* 19 Md.App. 640, 313 A.2d 563 (1974), the instruction should have been given.

In *Mumford,* the defendant went on a burglary spree with several other people. While the defendant was burglarizing a house, two of her cohorts were stealing property from an adjacent barn. Unbeknownst to the defendant, the owner came home and went to her barn. The cohorts fell upon her and raped and murdered her. The defendant was charged with the murder along with her cohorts. We ruled that the defendant was not criminally responsible for the murder if "the homicide was a fresh and independent product of the mind of one of the confederates, outside of, or foreign to, the common design." *Mumford,* 19 Md.App. at 644, 313 A.2d 563.

**530**

■ Maryland Rule 4–325 requires a trial judge to give the jury any requested instruction which correctly states the *applicable* law, but a requested instruction does not have to be given if the matter is fairly covered by the instructions actually given. *Hemingway v. State*, 76 Md. App. 127, 137, 543 A.2d 879 (1988).

■ In the appellant's case, there were no facts which created any basis for the jury to believe that the murder of Susan Sullivan was the "independent product of the mind" of Roger Blake. In stark contrast to the *Mumford* case, the evidence in this case showed that the appellant was physically present during the commission of the homicide and knew about it. It is clear that the trial judge properly refused defense counsel's request because the requested instruction was inapplicable to the evidence. Moreover, the matter of the law of aiders and abettors was fairly covered by the trial judge's other instructions.

## V. *The Sentence*

■ Finally, the appellant contends—without presenting any argument—that his sentence of life without parole is illegal because the statute under which he was sentenced, Art. 27, §§ 412 and 413, is unconstitutional.

The Court of Appeals, in *Woods v. State*, 315 Md. 591, 556 A.2d 236 (1989), has held the statute to be constitutional.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.