623 A.2d 677

Ronald Anthony MANNO

v.

STATE of Maryland.

No. 1038, Sept. Term, 1992.

Court of Special Appeals of Maryland.

April 28, 1993.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before BISHOP, ALPERT and DAVIS, JJ.

DAVIS, Judge.

Appellant, Ronald Anthony Manno, was tried and convicted at a bench trial in the Circuit Court for Baltimore County (Turnbull, J.) of first degree murder, use of a handgun in the commission of a felony, use of a handgun in the commission of a crime of violence, and common law assault. The trial judge merged Counts III and IV (use of a handgun in the commission of a crime of violence and assault) into the first two counts and, on May 27, 1992, imposed a sentence of life imprisonment for first degree murder and a concurrent term of twenty years imprisonment for use of a handgun in the commission of a felony. On appeal, Manno asks:

1. Did the trial judge apply the wrong standard in finding [him] guilty of first degree murder?
2. Did the trial judge err in refusing to grant [his] motion to suppress evidence seized following the unlawful search of [his] car?
3. Did the trial judge err in refusing to grant [his] motion to suppress statement?
4. Did the trial judge err in finding the statement of Mary Flora to be admissible as an excited utterance?

The facts essential to our review of the issues presented are not seriously disputed. At approximately 12:45 on the morning of August 11, 1991, forty-year-old Mary Flora died as a result of a gunshot wound inflicted by her 53–year–old scorned lover, appellant, Ronald Manno. David Chiasson, an anatomic pathologist who performed the autopsy on the victim, opined that the cause of death to Flora was a gunshot wound to the back of the left chest, which fact was confirmed in appellant's testimony. After testifying how the romantic relationship with Mary Flora developed from their meeting on December 8, 1990 to a point where the couple spent three to four nights per week in her apartment, Manno, a twice-married father of three adult sons who was separated from his second wife, indicated that Flora had told him that she wished to terminate the relationship. He had checked into a motel several days prior to the shooting but had gone to recover his belongings from her residence on the night before her death.

On the night in question, he was sitting in his car on the parking lot of Rascal's nightclub where the shooting ultimately occurred when he saw her car drive up, whereupon she told him she would appreciate it if he didn't remain on the premises. Appellant then drove to Martinique's bar and had three or four drinks, after which he returned to Rascal's nightclub and approached the victim, putting his arms around her on the dance floor. According to his testimony, when she nibbled his lip, he backed off and pushed her. Concerned about the potential disturbance, a bouncer approached the pair and requested that appellant leave. Manno complied, departing

again for Martinique's. After several drinks, he returned to the vicinity of Rascal's where he saw Flora leaving. When he beckoned for her to come over to the car, he told her how depressed he was and that he wanted to know why the breakup was happening. He said that he advised the victim that he would rather end it all than lose her and that what he meant was that he would shoot himself.

Concerning the events around the shooting, appellant stated:

And I thought, there must be something, if I scare her or startle her, fire a shot out the window. I reached, I just laid the gun down, cocked it, just fired out the window what I thought was in the air. Never looked, thought [sic]. She had just about reached her car and I looked to the right and she said, she spun around and she spun around [sic] and yelled, "Ronnie, call a doctor, Ronnie, call a doctor," and I jumped out of the car and ran over. She was going down, hit her knees very hard, fell forward, hit her head very hard. I ran over to her and I said, I said Mary, I was hysterical or in shock. I just said, Mary, what's happened or something to that effect. And she must have lost consciousness. I was getting, she didn't say anything.

Appellant asserted that he ran to a telephone booth but could not call for assistance because he had no change. He then "just started to drive," throwing the weapon out of the car window "somewhere." He testified that he did not intend to kill Flora and that the shooting was an accident.

Arriving at approximately 1 a.m. on the morning in question, paramedic Steve Yealdhall inserted an "IV" into the victim in an attempt to replace lost fluids, and "military anti-shock trousers" were utilized to push the blood from the victim's legs to the chest area. According to Yealdhall, when asked what happened to her, Flora responded that her boyfriend, Ron Manno, shot her.

Officer James Martin accompanied the victim to the hospital, during which time he heard Flora call for her mother and plead that she did not want to die. Officer Martin described

Flora's condition as being weak and in a state of shock. Corporal James Chaconas had also arrived on the scene while paramedics were attempting to stabilize the victim. According to Chaconas, once the paramedics succeeded in getting the victim to respond to the question as to who she was, he felt that this would be the last opportunity to ascertain what happened and accordingly he inquired. His testimony regarding her response was:

OK. At this time when she replied her name was Mary, I asked her at that point what had happened. Then she replied that her boyfriend had shot her. My next question to her was, who was her boyfriend. She immediately responded, Ron Manno. I asked her, where did he live? She said, Brooklyn. And I said, Brooklyn, New York or Brooklyn, Maryland? She said, Brooklyn, Maryland. The paramedics picked her up and took her away.

Flora subsequently died as the result of the gunshot wound. Later, the same day of the shooting, Manno was stopped by the police while operating his vehicle. Officer John Grumbach testified that, at approximately 9:23 a.m., appellant was ordered to leave his car and was advised of his rights but insisted that he "did not want to talk about it." At approximately 10:05 a.m. at the police station, however, appellant agreed to make a statement, wherein he related that he had gone to the Club Martinique, where he had three drinks and thereafter returned to Rascal's nightclub where he was rebuffed when he kissed Flora, who was there in the company of a tall, blonde woman. After relating how the bouncer, identified by Detective Brady as Bill Leach, ordered him out of the bar, appellant remained silent until asked why he shot Flora. He responded by relating how he had gone to see his psychiatrist at the Greater Baltimore Medical Center at 4 or 5 on the morning of August 11 but had never gone inside to see the psychiatrist. He complained that the psychiatrist, Dr. Covey, considered his mental condition to be a joke and, at that point, appellant declined to answer any more questions without the presence of his attorney. Additional facts as are pertinent will

be provided where necessary and relevant to the arguments that follow.

## LEGAL ANALYSIS

### I.

■ Appellant initially contends that the court's finding of guilty of first degree murder "was based on a faulty legal premise, i.e., that 'a specific intent to kill' is the equivalent of premeditation and deliberation." We have examined the record transcript of the court's oral opinion and nowhere find a statement by the trial judge that a specific intent to kill is the equivalent of premeditation and deliberation. An examination of the relevant portions of the oral opinion is instructive:

From here, from that point, his testimony in my opinion becomes incredible. This man was bound and determined on this particular evening to have a further confrontation with this woman, who he deeply loved. Equally, she was determined not to have any further relationship with him and I am convinced he went back looking for her. Now, whether or not he was actually on the parking lot laying in wait and for how long is open for debate. But even that is not sufficient because the Court of Appeals has said that lying in wait at least at this point in the case law of Maryland, they have not decided *whether that's a sufficient aggravating factor sufficient by itself to raise murder to a level of first degree.* So, therefore, when the confrontation took place on the parking lot, and that's *State versus Selby,* 319 Md. 174 [571 A.2d 1236, 1990], *it is a question at that point as to what the Defendant intended to do.* It is incredible that he suggests that he picked a loaded pistol up from the back seat and after a discussion with her, he without looking fired the pistol and accidentally she was struck. I reject the Defendant's version with regard to that because it is obvious, even if he were trying to scare her, he is accomplished to some extent with firearms, she left the passenger side of his automobile, was walking to her car, and he doesn't fire the gun in the car, he doesn't fire it out

the driver's window, he doesn't shoot it in the air, he turned and, as he says, I didn't look, but I don't believe him and fired it through the passenger window at the victim, who was not very far away from him at all. He testified that during their conversation, he said, "I'll end it all rather than lose you." He wants me to conclude that he was talking about his own suicide, but the fact is his testimony is not credible and, frankly, that coupled with his actions after the shooting leave this Court in a position where it is convinced beyond a reasonable doubt and to a moral certainty that he turned, he had the specific intent to kill, he fired that gun, it struck the victim in the back, she died as a result thereof and, therefore, is inescapable that he's guilty of murder in the first degree. [Emphasis added.]

While it is true, as the State concedes, that the trial court never uttered the magic words "premeditation and deliberation," patently the court's analysis proceeded along two tracts, *i.e.*, a consideration of whether the evidence was sufficient "to raise murder to a level of first degree" and a rejection of appellant's contention that "he without looking fired the pistol and accidentally she was struck."

Significantly, the Court discussed the decision of the Court of Appeals in *State v. Selby*, 319 Md. at 178–79, 571 A.2d 1236. In *Selby*, the Court of Appeals had determined that it would leave for another day the question of whether lying in wait serves as a sufficient factor, standing alone, to raise the level of murder to first degree or whether lying in wait is but one example of the premeditation and deliberation necessary to prove first degree murder. Bearing in mind that the court was considering whether returning to the parking lot and awaiting the victim's exit from the nightclub constituted lying in wait as discussed by *Selby*, the trial court could have only been engaging in a legal analysis to determine whether there was premeditation and deliberation because that indeed was the issue in *Selby*. Consequently, the trial court concluded that there was sufficient other evidence upon which to base a finding of first degree murder, discounting the theory of lying in wait as necessary for it to enter a finding of guilty of

murder in the first degree. Referring to the point in time when appellant confronted Flora in the parking lot of Rascal's nightclub, the court said: "It is a question at that point as to what the defendant intended to do." In other words, the court was alluding to whether the design or plan to kill had formed in appellant's mind at that time. The court's analysis continued by concluding that appellant's assertion that he picked up a loaded pistol from the back seat and accidentally fired the pistol without looking was unbelievable.

Bearing in mind that the thrust of appellant's testimony was that the shooting was accidental, uppermost in the court's mind as it rendered its oral opinion was a rejection of the theory that the shooting had been an accident. The antithesis of the shooting being accidental, of course, is that it was done intentionally. It is for that reason that the court dwelled on the factor that indicated the flaws in the accidental shooting theory, *i.e.*, that appellant "doesn't fire the gun in the car, he doesn't fire it out the driver's window, he doesn't shoot it in the air, he turned and, as he says, I didn't look."

In sum, the trial judge's focus on the existence of the specific intent to kill was aimed at rejecting appellant's contention that the shooting was not intentional, but rather accidental. The court attempted to articulate premeditation and deliberation by its finding that it did not believe appellant just happened to have a loaded pistol that he obtained from the back seat of the car at the time he beckoned Flora over to the car. Implicitly, the court was inferring that the fully formed plan to kill the victim existed at the time appellant beckoned the victim to get into his automobile.

Appellant does not contend that the evidence is insufficient to support his conviction but rather that the trial judge misapplied the law. The case *sub judice,* in precise terms, presents us with a record wherein there is more than ample evidence to support a finding of guilt of first degree murder; and the trial judge, in a non-jury proceeding, determined that "aggravating factors" sufficient to elevate the offense to first degree murder were present but simply failed to articulate the existence of premeditation and deliberation. We do not be-

lieve, under the circumstances, that the failure of the trial judge to articulate specifically the words "premeditation and deliberation" requires reversal of appellant's conviction.

Had the lower court, by reason of a "faulty legal premise" made a finding of guilt that could have otherwise been supported by different findings of fact, we would be required to reverse. *See State v. Gover*, 267 Md. 602, 298 A.2d 378 (1973) (wherein trial court erroneously concluded that defendant was so drunk that he did not know what he was doing, but, in the court's view, he could not avail himself of the defense of voluntary intoxication because the court did not believe voluntary intoxication could be a defense to robbery, a specific intent crime). As we have observed, nowhere in the record are we able to find a statement by the trial judge that a specific intent to kill is the equivalent of premeditation and deliberation. Thus, appellant's assertion that the court's finding of guilty of first degree murder was based on a faulty legal premise is itself based on a faulty and indeed erroneous factual premise.

Here, the trial court engaged in a proper analysis in determining that a necessary element, specific intent to kill, was present in order to reject appellant's claim that the shooting was accidental. That the trial judge did not articulate the words "premeditation and deliberation" is not fatal in the case before us because, at no time, did the court say that a finding of premeditation and deliberation was unnecessary to support appellant's guilt of first degree murder.[1] Furthermore, the court noted all of the events leading up to the shooting, including the facts that appellant was bent on having a further confrontation, that he went back to the nightclub looking for her, and that it was appellant who summoned the victim to his car where he possessed the instrument to accomplish the fatal deed. In view of the overwhelming evidence that appellant

---

1. See *State v. Chaney*, 304 Md. 21, 497 A.2d 152 (1985) (wherein Court of Appeals held that "implicit" in the words "wilful," "deliberate," and "with premeditation" is averment that the killing was unlawful, and thus the defect in indictment did not go to jurisdiction of the court).

possessed the fully formed purpose to kill at least from the time he beckoned Flora to get inside his automobile with him and then retrieved the pistol from the rear seat, there was indeed ample evidence from which the court could properly find that there was premeditation and deliberation sufficient to support appellant's guilt of murder in the first degree.[2]

## II.

■ Appellant next contends that the seizure of his personal papers found in an envelope in the trunk of his vehicle after his automobile had been impounded was the result of a warrantless search and seizure, "with no applicable exception to the warrant requirement." On December 9, 1991 the Circuit Court for Baltimore County conducted a hearing on the motion to suppress the evidence recovered from appellant's automobile. At the conclusion of the hearing on the motion to suppress, the lower court indicated that it would take the motion under advisement as well as the motion to suppress the statement taken from appellant. On January 24, 1992 the lower court indicated that it had received from counsel copies of court decisions, which the court had read; and the court further advised counsel that it had reviewed the notes of the court reporter and was satisfied that Detective Brady had testified that he had been looking for the murder weapon as well as other evidence against appellant. The court simply stated: "So I am going to rule that the search was appropriate and will allow the items seized from the trunk of the vehicle into evidence. I'll deny the motion to suppress that search . . . . . "

On the second day of the trial on the merits, Detective Peter S. Evans of the Baltimore County Police Department Crime Laboratory identified State's Exhibit 14, a letter in an

---

**2.** We hasten to add that trial judges, in rendering oral opinions, should take pains to deliver decisions with great precision and care, thereby obviating the need for this Court to make implicit findings from the context of the opinion. In preparing to render the opinion, a little thought and deliberation beforehand would facilitate couching conclusions of law in terms compatible with the required legal standard.

envelope that was found in the trunk of the car and that was marked "to the media." The court overruled the continuing objection of Manno's counsel and was advised by the prosecutor that she was offering "just the one letter" rather than the package of letters. The letter admitted read:

This is a tragedy of untold proportions. Mary knew I loved her—I told her a thousand times. But it wasn't enough. Having someone love her wasn't enough. She needed more. She flirted outrageously. Her final flirtation was the fatal one. She initiated a conversation with three blacks. How outrageous. To be with a man like me and still need attention from such low-lifes.

What could three blacks off the street contribute to her life? Nothing! Absolutely nothing! What a humiliation to have to endure, and in the presence of so many people.

(Signature) Ron M.

Citing *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and *Fowler v. State,* 79 Md.App. 517, 526–27, 558 A.2d 446, *cert. denied,* 317 Md. 392, 564 A.2d 406 (1989), the State posits that the *Carroll* doctrine permits the warrantless search of a motor vehicle where police have probable cause to believe that the vehicle contains contraband and that the exception to the Fourth Amendment warrant requirement is justified because of the exigent circumstances caused by the inherent movability of a motor vehicle. Detective William Brady testified that, upon being directed by Lieutenant Randall Russen, unit commander of the Homicide Section of the Baltimore County Police Department, to return from the murder scene to Baltimore County police headquarters, he arrived in the office of the Fugitive Section at approximately 10:00 a.m. on August 11, 1991. As he, Officer Grumbach and a uniformed Baltimore County police officer conducted questioning of appellant, Manno's vehicle had been towed from Towson State University to the Baltimore County police headquarters for processing. Brady testified, "My lieutenant contacted the Crime Lab, told them it was being towed in which was the results of the conversation between myself and Lieutenant Russen about the vehicle and we were looking

for the gun and various pieces of evidence." The record thus indicates that clearly the police were looking for the murder weapon and any other incriminating evidence.

Relying most heavily on *Waine v. State,* 37 Md.App. 222, 231, 377 A.2d 509 (1977), and *Duncan and Smith v. State,* 281 Md. 247, 378 A.2d 1108 (1977), appellant charges that the instant procedure violates the Fourth Amendment because it is an inventory search, which is in reality a pretext for concealing an investigative police motive. Manno postulates that mere legal custody of his effects, however, does not dispense with constitutional requirements of searches thereafter made, citing *Cooper v. California,* 386 U.S. 58, 61, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), and *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

We note, at the outset, that appellant was in custody at the time that the vehicle in question was impounded and that there was no likelihood that the vehicle would be released from police custody. We further note that there is no suggestion by Detective Brady that this was an inventory search. Thus, the warrantless search of appellant's vehicle must be validated on the basis of an exception to the warrant requirement other than an inventory search. Our review of Fourth Amendment case law persuades us that there was indeed probable cause to search Manno's vehicle and that, once the envelope marked "to the media" was discovered in the translucent container, appellant's Fourth Amendment right to be free from unreasonable searches and seizures yielded because of the diminished expectation of privacy in a correspondence within an envelope so marked. A review of the development of the case law as it has evolved from the seminal case of *Carroll* to the lines of authority that have considered containers found in automobiles is helpful in our analysis of the seizure in question.

In 1925, the Supreme Court, in establishing an exception to the warrant requirement for moving vehicles, recognized

a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship,

motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

*Carroll v. United States,* 267 U.S. at 153, 45 S.Ct. at 285.

In 1977, the Supreme Court again considered the mobility of the object of the search, this time a 200 pound double-locked foot locker containing marijuana. *Chadwick, supra.* The federal narcotics agents, in *Chadwick,* surveilled the defendants as they removed the foot locker from a train and carried it through the station, depositing the locker into the trunk of a car that awaited. The locker was seized and searched as the agents simultaneously arrested the defendants. The government had argued that the search of movable luggage could be considered analogous to the search of an automobile. The Supreme Court, in finding the search unreasonable, held that a person expects more privacy in his luggage and personal effects than he does in his automobile, 433 U.S. at 13, 97 S.Ct. at 2484. The Court also observed that storage facilities are usually more available to accommodate luggage where such facilities may not be available for the storage of vehicles that are seized. *Id.* at 13, n. 7, 97 S.Ct. at 2484, n. 7.

Two years after the decision in *Chadwick,* the Supreme Court in *Arkansas v. Sanders,* 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), extended the rule in *Chadwick* to apply to a suitcase actually being transported in the trunk of a car. Armed with probable cause to believe that the suitcase contained marijuana, they watched as the defendant placed the suitcase in the trunk of a taxi and thereafter pursued the taxi for several blocks, ultimately stopping it. Although the Court prior to *Sanders* had applied the *Carroll* doctrine to searches of integral parts of an automobile itself, it had not extended the doctrine to the warrantless search of personal luggage "merely because it was located in an automobile lawfully stopped by the police." *Sanders,* 442 U.S. at 765, 99 S.Ct. at 2594. Emphasizing the heightened expectation of privacy in personal luggage, the Court concluded that the presence of luggage in an automobile did not diminish the owner's expec-

tation of privacy in his personal items. *Id.* at 764–65, 99 S.Ct. at 2593–94.

In *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), officers of the District of Columbia Police Department, upon information received from an informant that an individual known as "Bandit" had just completed a narcotics sale, stopped a vehicle driven by a man who matched the informant's description. After the respondent Ross was ordered out of the vehicle, the officers searched him and discovered a bullet on the front seat of the car and a pistol in the glove compartment. One of the detectives took Ross's keys and opened the trunk of the vehicle, where he found a closed brown paper bag that he opened and therein discovered a number of glassine bags containing a white powder. One of the officers replaced the bags, closed the trunk, and drove the car to police headquarters.

At the station, one of the officers thoroughly searched the vehicle and found the "lunch-type" brown paper bag and a zippered red leather pouch. Unzipping the pouch, he discovered $3,200 in cash. Laboratory analysis later revealed the powder to be heroin. After Ross was convicted, the Supreme Court ultimately affirmed that decision, holding:

> In the same manner, an individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband. Certainly the privacy interests in a car's trunk or glove compartment may be no less than those in a movable container. An individual undoubtedly has a significant interest that the upholstery of his automobile will not be ripped or a hidden compartment within it opened. These interests must yield to the authority of a search, however, which—in light of *Carroll*—does not itself require the prior approval of a magistrate. The scope of a warrantless search based on probable cause is no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause. Only the prior approval

of the magistrate is waived; the search otherwise is as the magistrate could authorize.

*Id.,* 456 U.S. at 823, 102 S.Ct. at 2172 (footnote omitted). The Court concluded by saying:

The exception recognized in *Carroll* is unquestionably one that is "specifically established and well delineated." We hold that the scope of the warrantless search authorized by that exception is no broader and no narrower than a magistrate could legitimately authorize by warrant. If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search.

*Id.* at 825, 102 S.Ct. at 2172.

Subsequent to the Supreme Court's holding in *Ross,* in *California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), it described what it considered to be the anomalous results stemming from its attempt to reconcile the *Chadwick–Sanders* rule. In *Acevedo,* a drug enforcement agent in Hawaii had telephoned one Officer Coleman of the Santa Anna, California police department that he (the agent) had intercepted a package containing marijuana that was en route to the Federal Express Office in Santa Anna and that was addressed to J.R. Daza at 805 West Stevens Avenue. The narcotics agent arranged instead to send the package to Coleman, who was to take the package to the Federal Express Office and arrest the person who arrived to claim it.

When Officer Coleman received the package and took it to the Senior Operations Manager at the Federal Express Office, a man who identified himself as Jamie Daza arrived to claim it. Daza drove to his apartment where he carried the package into the apartment. A little over an hour later, the officers observed Daza leaving the apartment and dropping the box that had contained the marijuana into a trash bin. Officer Coleman left to obtain a search warrant and, about twenty minutes later, the officers who remained on the scene observed Richard St. George leave the apartment carrying a blue knapsack. The officers stopped St. George as he was

driving off and searched the knapsack, discovering 1 1/2 pounds of marijuana. Twenty-five minutes later, the officers saw respondent Charles Acevedo enter Daza's apartment, stay for approximately ten minutes, then reappear carrying a brown paper bag that appeared to be full. The bag was the size of the wrapped marijuana packages that had been sent from Hawaii. Acevedo walked to a silver Honda automobile in the parking lot, placed the bag in the trunk of the car, and started to drive away. The officers stopped him, opened the trunk and the bag, and found marijuana. Respondent pleaded guilty to possession of marijuana for sale but appealed the denial of his suppression motion.

In its opinion, the Supreme Court discussed what it considered to be an anomaly in the two lines of decisions dealing with the search of vehicles and containers found therein:

> The *Chadwick–Sanders* rule not only has failed to protect privacy but it has also confused courts and police officers and impeded effective law enforcement. The conflict between the *Carroll* doctrine cases and the *Chadwick–Sanders* line has been criticized in academic commentary. ... One leading authority on the Fourth Amendment, after comparing *Chadwick* and *Sanders* with *Carroll* and its progeny, observed: "These two lines of authority cannot be completely reconciled, and thus how one comes out in the container-in-the-car situation depends upon which line of authority is used as a point of departure." 3 W. LaFave, Search & Seizure 53 (2d ed. 1987).

*Id.* at ——, 111 S.Ct. at 1989. The Court continued by further expounding on the anomaly:

> The discrepancy between the two rules has led to confusion for law enforcement officers. For example, when an officer, who has developed probable cause to believe that a vehicle contains drugs, begins to search the vehicle and immediately discovers a closed container, which rule applies? The defendant will argue that the fact that the officer first chose to search the container indicates that his probable cause extended only to the container and that *Chadwick* and *Sanders* therefore require a warrant. On the

other hand, the fact that the officer first chose to search in the most obvious location should not restrict the propriety of the search. The *Chadwick* rule, as applied in *Sanders*, has devolved into an anomaly such that the more likely the police are to discover drugs in a container, the less authority they have to search it.

*Id.* at ——, 111 S.Ct. at 1989–90. In attempting to put to rest the confusion, the Court reiterated the long-standing precept that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions," citing *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978).

The Court thusly attempted to resolve what it considered to be the conflict in the *Chadwick–Sanders* rule:

Until today, this Court has drawn a curious line between the search of an automobile that coincidentally turns up a container and the search of a container that coincidentally turns up in an automobile. The protections of the Fourth Amendment must not turn on such coincidences. We therefore interpret *Carroll* as providing one rule to govern all automobile searches. The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.

We recently held that once police are authorized to conduct a search and seizure pursuant to the *Carroll* doctrine, it is permissible for them to delay the search, and it is not necessary to secure a warrant during the delay. *Fowler, supra.* We went on to observe in *Fowler*, 79 Md.App. at 527–28, 558 A.2d 446, citing *U.S. v. Johns*, 469 U.S. 478, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985):

There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure. *Texas v. White*, 423 U.S. 67, 68 [96 S.Ct. 304, 305, 46 L.Ed.2d 209] (1975) (per curiam); *Chambers v. Maroney*, 399 U.S. 42, 52 [90 S.Ct. 1975, 1981, 26 L.Ed.2d 419] (1970). "[T]he justification to conduct such a warrantless search

does not vanish once the car has been immobilized." *Michigan v. Thomas*, 458 U.S. 259, 261 [102 S.Ct. 3079, 3080–3081, 73 L.Ed.2d 750] (1982), *(per curiam )*. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, *and there is no requirement of exigent circumstances to justify such a warrantless search.* [Emphasis supplied.]

The scope of the warrantless search in the instant case, clearly based on probable cause, was that it extended to all parts of the vehicle in question. The bedrock of Fourth Amendment analysis devolves upon the singular question of reasonableness as defined and refined by judicial construction.

Given that we are here concerned with the search of a vehicle a mere ten hours subsequent to the criminal episode and substantially contemporaneous (within less than an hour) of appellant's apprehension and arrest, the seizure of appellant's personal effects was reasonable. It should be noted that the container in question was a clear plastic bag rather than a double-locked foot locker, as was the case in *United States v. Chadwick, supra.* Notwithstanding that the investigating officers had to open and read the papers contained in the plastic container before they could ascertain the evidentiary value, the translucency of the container undercuts appellant's expectation of privacy. Significantly, the envelope was marked "to the media." Under *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the expectation of privacy is crucial to a Fourth Amendment analysis. Because the Fourth Amendment prohibits only unreasonable searches and seizures, where the prior intrusion was constitutionally permissible by reason of the probable cause to search for the murder weapon, recovery of an envelope addressed "to the media" did not violate the Fourth Amendment prohibition.

The bottom line, then, is the existence *vel non* of probable cause to believe the automobile contained contraband or evidence of a crime. Once there was probable cause to search the vehicle, Detective Evans legitimately discovered the translucent bag containing the documents recovered. Because the

outside of the envelope was marked, "to the media," the expectation of privacy was thereby diminished.

There being no requirement of exigent circumstances to justify the warrantless search where there exists probable cause to believe that the vehicle contains contraband and where the transparent bag was discovered during the warrantless search, as in the case at bar, the recovery of the letter is reasonable and withstands constitutional proscription.

### III.

■ Relying on *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), appellant next asserts that his statement to the investigating officers should be suppressed because the interrogating officers were obliged to cease all questioning once he indicated he wished to remain silent. Appellant acknowledges that, in *Mosley*, the Supreme Court held the statement to be admissible but urges that that holding was based on the fact that the second crime was unrelated to the first and that "the officers did not attempt to resume interrogation on the robbery or persuade the defendant to reconsider his position."

Officer John Grumbach of the Towson State University police department spotted appellant's Pontiac automobile on the campus of Towson State University at approximately 9:23 on the morning of August 11, 1991 and, after positioning his vehicle behind appellant, announced, "Ronald Manno, in the blue Pontiac, please exit your vehicle." He ultimately advised appellant of his *Miranda* rights, including his right to remain silent, but did not attempt to question him. Once appellant was transported to the Baltimore County police headquarters, Detective William Brady spoke to Officer Grumbach in the Fugitive Section where the latter had been present with appellant and a uniformed Baltimore County police officer. After Officer Grumbach left the room, Detective Brady advised appellant of his *Miranda* rights and asked if appellant "wanted to talk to us."

Detective Brady further indicated that he advised appellant he was there to talk about what had happened and added that: "I told him I wanted to talk to him about the shooting of Mary Flora and he told me he wanted to talk to me. He agreed to talk to me." At that point, appellant related the sequence of events that transpired prior to his being ejected by the bouncer, Bill Leach, from Rascal's nightclub. According to Detective Brady, "at that point in time he just sat there in silence ... sat there silent but didn't say anything."

When Detective Brady asked appellant why he shot Mary Flora, according to Brady, Manno responded that he had been a very sick man for the past eight months and had been at the Greater Baltimore Medical Center Hospital until 4 or 5 that morning waiting outside the hospital where his psychiatrist, Dr. Covey, has an office. At that point, appellant stated, "I don't think I should say as [sic] an attorney." Upon being asked whether appellant indicated he wanted an attorney, Detective Brady responded that appellant did not "until after the interview, sir." Detective Brady testified that at that point he ended the interview. He added that Manno had never mentioned an attorney at any point during the interview and did not do so until he related how he had been a very sick man and had been seeing the psychiatrist.

In a footnote in appellant's brief, he attempts to distinguish our holding in *Latimer v. State*, 49 Md.App. 586, 433 A.2d 1234 (1981), where we held that *Mosley* did not create a *per se* proscription of all further interrogation once the person being interrogated has invoked the desire to remain silent. Manno contends that there was only an implicit indication of a desire to remain silent by reason of Latimer's refusal to sign the waiver form as contrasted with an expressed assertion that he wanted to remain silent.

Initially, Officer Grumbach of the Towson State University police department maintained throughout his testimony that he at no point attempted to ask appellant about what happened. When Manno says that he expressly asserted that he wished to remain silent, he was, according to Grumbach, asserting his intentions to an officer who was not only refrain-

ing from applying any coercive force to extract a statement, but who was indeed affirmatively telling Manno, "I am not going to ask you about it." It is elemental to Fifth Amendment constitutional review that the overriding consideration is whether a statement is the product of the compulsive and coercive effect of deliberate efforts on the part of agents of the State to extract incriminating information against the will of the target of the investigation. In no sense can the actions of Officer Grumbach be considered the opening volley of a succession of coercive efforts on the part of the police to extract a statement from appellant. There indeed was no attempt on his part to wear down the will of appellant or to obtain a statement that was the product of intimidation, coercion, deception, or overborne will. *See Lodowski v. State,* 307 Md. 233, 513 A.2d 299 (1986).

More importantly, we discussed, in *Latimer,* the Supreme Court's holding in *Mosley* and concluded that it did not require that questioning cease and only resume when counsel is present once a person has expressed a desire to remain silent. *Latimer,* 49 Md.App. at 589, 433 A.2d 1234.

We observed that the *Mosley* Court distinguished between a request to remain silent and a request for an attorney accompanied by a request that all interrogation cease until an attorney is present. *Mosley,* 423 U.S. at 105 n. 10, 96 S.Ct. at 326 n. 10, quoting *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966).

We further set forth the rule succinctly as enunciated in *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981):

We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

There was clearly evidence before the Circuit Court for Baltimore County that appellant did not indicate he wanted an

attorney "until after the interview." Under the Supreme Court's decisions in *Mosley* and *Edwards* and our decision in *Latimer*, by no stretch can appellant's statement that "I don't want to talk about it" be interposed as a requirement that counsel be present before there could be any further interrogation.

## IV.

The last contention presented for our review is that the trial judge erred in admitting statements made by the deceased five to ten minutes after treatment had begun by paramedics. Specifically, appellant claims that "there was simply no evidence that Flora was so overwhelmed by the incident that any statement would be without benefit of reflection." The State responds that this is "completely absurd." Flora had called for her mother and proclaimed she did not want to die. When Corporal James Chaconas asked her her name and what happened, Flora responded, "Mary," and that she had been shot by her boyfriend, Ron Manno, who lived in Brooklyn, Maryland.

The court believed it would have difficulty justifying admission of the statement as a dying declaration, opining:

Suffice it to say that I agree with the posture that were the only exception to the hearsay rule in this case that of a dying declaration, that the Court would have far more problems with regard to the admissibility and would have to carefully, much more carefully than under the second theory, consider exactly the facts, the circumstances, the nature of the injuries to the victim and the exact words used by her and when they were used by her. And although the Court, as a legal theory, could possibly under Maryland law and maybe not under law from other areas, admit the statements as a dying declaration, I do not feel that I have to reach that posture.

The Court, relying on *Mouzone v. State,* 294 Md. 692, 452 A.2d 661 (1982); *Eades v. State,* 75 Md.App. 411, 541 A.2d 1001 (1988); *Johnson v. State,* 63 Md.App. 485, 492 A.2d 1343

(1985); *Moore v. State,* 26 Md.App. 556, 338 A.2d 344 (1975); and *Long v. State,* 3 Md.App. 638, 240 A.2d 620 (1967), admitted the statement as an excited utterance. It concluded that the two preconditions for admission of the statement on this basis were (1) the occurrence of a startling event and (2) whether a reasonable person in declarant's shoes would have been startled, excited, or upset. Of course, the ultimate consideration is whether these factors preclude the opportunity for reasoned reflection or expressions calculated to advance one's self-interest. As stated by Professor Wigmore:

This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts.

6 *Wigmore on Evidence* § 1751 (3rd ed. 1940).

The circuit court, in admitting the statements as excited utterances, ruled:

It's clear to me that a person who is the victim of a shooting, especially when you take into consideration where the shot in this place entered the victim's body, the fact that she was face down on the ground when found by the initial witness, and that she was in the similar state upon arrival of the paramedics within a very short period of time from their notification, that the event was startling, not only to a reasonable person, but certainly to the victim in this case. And I suggest that her initial comments, which were, as I recall, somewhat spontaneous, that she was asking for her

mother, and said, please call my mother, I want my mother, three or four times, certainly bolsters the Court's opinion that not only the act itself was startling in nature, but that the declarant was in a startled, excited and upset condition.

The second aspect is whether or not at the time of the statement, the declarant remained so under stress that was caused by the startling event as to preclude reflection. Now, the Defense argues that that was not the case, and that these were, in fact, responses to questions by investigating personnel and/or police officers. I think it's clear from both *Long,* and *Johnson versus State,* in *Long versus State,* two troopers of the Maryland State Police arrived at a home of the victim and the one trooper, while it was being, the victim was receiving first aid, asked Mr. Long, the victim in that case, what had happened. And he stated he had been in an argument with his son and his son shot him. Certainly, *Johnson,* again, is similar in nature because of the fact that it was in response to direct questions.... [F]rom the facts of this case, I find that the victim was still under the stress caused by the startling event and that she in no way was reflecting and answering questions after having given them due consideration. She, in response to a question from a police officer, which I find to be appropriate, states in response to what happened, "My boyfriend shot me," and then again, apparently, the Corporal who had overheard that said, "What happened, Mary?" "My boyfriend shot me." The investigating Corporal said, "Who?" The Defendant's name was then used. Then the Corporal said, "Where does he live?" In Brooklyn, Maryland. And although the paramedic did not indicate that the Corporal had said Brooklyn, Maryland or Brooklyn, New York, the Corporal indicated that, but the Court has no problem whatsoever that this is, in fact, an excited utterance. It is also interesting to note that some brief time later, when she was on her way down to the emergency room at Shock Trauma, she repeated some of the statements that she had spontaneously stated earlier and I am convinced at that point that she was still under the influence of the stressful

situation. And under all the facts that I have heard before me today, I find that they were excited utterances, that they are an exception and the Court's going to overrule the Motion to Suppress those statements that were made.

We believe that the well-reasoned ruling of the circuit court properly denied appellant's Motion to Suppress, and we accordingly adopt the court's rationale. The court did not err.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.