703 A.2d 861

**Edward Charles STOUFFER**

v.

**STATE of Maryland.**

**No. 548, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Dec. 3, 1997.

Reconsideration Denied Jan. 27, 1998.

594

Denise Oakes Shaffer, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and M. Kenneth Long, Jr., State's Atty. for Washington County, Hagertown, on the brief), for Appellee.

Argued before MOYLAN, DAVIS and SALMON, JJ.

DAVIS, Judge.

On October 10, 1995, a grand jury of Washington County filed an eleven-count indictment, charging appellant Edward Charles Stouffer, *inter alia*, with first degree premeditated murder, murder committed in the perpetration of a kidnapping, and kidnapping.

Appellant, on March 28, 1996, filed a Suggestion for Removal and a Response to State's Request for Discovery. The court, after disposing of several pre-trial motions, denied appellant's suggestion for removal.

On November 4, 1996, the jury returned verdicts of guilty as to first degree felony murder and kidnapping. Appellant, on November 12, 1996, moved for a new trial, and, after a hearing was held, the motion was denied.

Appellant, on February 3, 1997, was sentenced to life imprisonment for the first degree felony murder conviction and to a concurrent thirty years for the kidnapping conviction. On February 26, 1997, appellant noted this appeal. Appellant presents seven questions for our review:

I. Was the evidence sufficient to support appellant's convictions?

II. Did the trial court err by repeatedly restricting defense cross-examination?

III. Did the trial court err in allowing the State to use prior statements of witnesses under the guise of refreshing their recollection or impeachment?

IV. Did the trial court err in allowing hearsay evidence concerning appellant allegedly threatening a key State's witness?

V. Did the trial court err in its instructions to the jury?

VI. Did the trial court err by failing to grant appellant's suggestion for removal?

VII. Did the trial court err in withholding, for some time, information from appellant that one of the jurors had been indirectly contacted by the deceased's father during the trial?

Because we hold the evidence indicates the homicide was not committed in the perpetration of the underlying felony, we shall reverse the judgment of conviction for felony murder.

## FACTS

In mid-January, Jeffrey Fiddler moved out of his father's West Virginia home and into the Young Men's Christian Association (YMCA) in Hagerstown, Maryland. Fiddler had also lived, off and on, at 12 Elizabeth Street in Hagerstown with Robert Schell (also known as Robert Starr).

On the morning of February 27, 1989, Fiddler was found dead by the side of a road near the Maryland–Pennsylvania State line. According to Pennsylvania State Police Trooper Edward Vymazal, who responded to the crime scene, Fiddler's

death was the result of a homicide, but no weapon was recovered.

An autopsy revealed that Fiddler had two stab wounds to the chest, some defensive wounds to the hand, a contusion or bruise to the back of the neck, and abrasions to the buttocks, left thigh, and left leg. There was evidence that Fiddler bled to death and that death could have taken up to one-half hour.

Dr. Neil Hofman, the forensic pathologist who performed the autopsy, and Pennsylvania State Police Trooper Donald Paul, testified that with such wounds large amounts of blood would be expected at the scene. Trooper Paul, who discovered Fiddler lying in a grassy area, however, rolled him over and saw very little blood. Due to the small amount of blood at the scene and the position of Fiddler's body, Trooper Paul testified that he believed Fiddler had been transported and dumped at the scene, after being killed somewhere else. Through a joint investigation, it had been determined that Fiddler's murder took place in or near Maryland and that he had been dumped in Pennsylvania.

Fiddler's body had been found without underwear, socks, or a jacket. Hofman testified that, during the stabbing, Fiddler's pants and shoes were off. Before his death, Fiddler was dragged, without his pants, across a rough granular black surface having a different composition from that found at the scene. He was later redressed.

The clothes, taken from Fiddler's body during the autopsy, were maintained at the Pennsylvania State Police Department until September 1989, when all of the evidence was turned over to the Hagerstown Police Department. From that time, the evidence was then maintained in the Hagerstown Police Department's evidence locker.

Shortly after the homicide, Sergeant Richard Johnson of the Hagerstown Police went into Fiddler's room at the YMCA, where he retrieved Fiddler's clothes and shaving kit. He unzipped the shaving kit and saw that it contained, among other grooming items, a hair brush. After retrieving Fiddler's belongings, Sergeant Johnson personally gave them to Fid-

dler's father, who put them in his basement where they remained untouched. Sometime in March 1990, Fiddler's father opened the shaving kit, removed the hair brush, and hand delivered the brush and sweaters to the Hagerstown Police Department, where the brush was immediately packaged.

At appellant's trial, several witnesses testified that they saw Fiddler just days before he died.

One night in February 1989, downtown at the Hagerstown Square (Square), Barbara Kelly saw Fiddler being chased by appellant, William Burral, and "two other guys." Fiddler had run behind her, across the street, down Washington Street, through the city parking lot and down by the alley, beside Rocky's Pizza Restaurant. She heard appellant tell Fiddler to "stay away from Becky."

On the Friday before Fiddler's body was found, Gregory Scott Smith, Jr., saw Fiddler at the YMCA and Fiddler told him that he had received a death note, but did not say from whom. Sometime that same night, according to the testimony of Fiddler's brother, Jimmy Fiddler (Jimmy), he saw Fiddler and they argued over $40 that Fiddler owed him for a car battery.

On a Friday night in February 1989, at the Double T Lounge, Kathy May Argo saw Fiddler talking with appellant and James Russell. Burral and Schell were also there that night. Argo said that she saw appellant making fun of Fiddler and Fiddler told her that "appellant and them" were harassing him. Fiddler told her that they were going to the river to party and, afterwards, Fiddler left with appellant, Schell, Burral, and Russell. Appellant, Burral, and Schell returned without Fiddler; they told Argo that Fiddler stayed at the party.

Carol Ann Bussard, another resident of Elizabeth Street, heard "a lot of hollering and screaming" outside in the early morning hours of the night in question. She looked out of her window and saw "two guys" fighting in the middle of the street—one was lying in the street and the other was strad-

dling him and beating his head against the street. Bussard heard a woman screaming for help and telling one of the men to stop because he was going to hurt or kill the other man. A third man then came up the street, grabbed the assailant and began to fight him. Meanwhile, the victim rolled under a parked truck and, afterwards, the others were attempting to locate him because he was "in bad shape."

Concerning appellant's whereabouts on the evening before Fiddler was found, one of appellant's former girlfriends, Rebekah Knodle Kogar, testified that she, appellant, and others, were at a friend's house on Broadway Street in Hagerstown when, later that afternoon, appellant, Russell, and Burral left together. Burral returned about 3:00 a.m., covered with "red stuff," and changed his clothes; appellant arrived sometime later that morning. The witness claimed to have overheard appellant talking with Burral about something that "got out of hand" on Elizabeth Street—they mentioned Fiddler and Schell. Schell also came by sometime that same morning.

Schell testified that, after he and Jimmy partied with friends at Schell's apartment on Elizabeth Street, around 10:00 p.m., he and Jimmy went to different bars where they were involved in two verbal altercations with "other guys." Hagerstown Police officers interceded after the second altercation and an officer drove the pair home.

After the officer drove him to Elizabeth Street, Schell went back downtown looking for Fiddler. When he arrived downtown, appellant and "two other guys" approached him. Appellant told him that he was "messing up" and that he was "narking on people." Appellant told Schell that, if he did not "get out of his face," he was going to take care of him. When Schell started to walk up Washington Street, appellant and the "other guys" proceeded in the same direction; Schell ran inside of a hotel, where he stayed for fifteen or twenty minutes until he no longer saw appellant. Later that night, Schell saw appellant and they began to argue, at which time a police officer arrived and told them to go their separate ways.

Officer Brian Barnhart testified that the altercation between Schell and appellant occurred at almost 3:00 a.m.

The testimony of Schell and Jimmy was consistent. On the night in question, they did not see Fiddler. Jimmy added that the ambulance was called because Melissa Bishop (Melissa) had hurt her back. When Jimmy heard the ambulance, he rolled underneath a truck and stayed there for fifteen minutes to one-half hour, until the ambulance left. He came from underneath the truck, went into the apartment, talked with Schell, and then went to sleep. A couple of hours after Melissa's father, Richard Bishop, left, he got up and went to Melissa's house on Main Avenue, leaving Schell at his apartment.

On March 18, 1989, Officer Wayne L. Shank of the Hagerstown Police Department was called to a reported suicide at 12 Elizabeth Street. When he arrived, Schell was bleeding from both wrists and told him that he had cut himself. Officer Shank testified that Schell had been drinking and told him that he was upset about being questioned about the Fiddler murder.

At another time in March 1989, Schell, according to his own testimony, was downtown when appellant approached him and told him that he was "messing up." At the same time, he saw two other people coming from across the street, so he started running and appellant was beside him. Schell ran towards Washington Street, was struck by a truck, and was taken to the hospital.

The same incident was described by other witnesses. Angela Tobery was down the street when Schell was hit by the vehicle. Appellant was about to hit Schell when Schell took off running. Tobery saw "a bunch" of people, including appellant, chase Schell. She did not see Schell get pushed; however, she told the police that people coming down the street were saying that appellant was chasing Schell because Schell was "running his mouth" about Fiddler being killed and appellant was telling Schell to "keep his mouth shut." Appellant told Schell that, if he said anything, he would "knock"

Schell's "teeth out" and Schell replied that he did not care because he was tired of it.

According to Tina Murray Desjardins, one of appellant's former girlfriends, appellant told her that Schell ended up in front of the truck to "keep his mouth shut." Tobery also stated that appellant told her that if Schell "runs his mouth, he knows what he is going to get." Appellant denied pushing Schell in front of the truck.

Sometime in August 1989, the Hagerstown Police searched the apartment at 12 Elizabeth Street; at that time, no one was living there. Blood stains were found at various locations in the apartment, including on a carpet in the attic. The evidence, however, did not reveal that any of the blood was Fiddler's. During the search, the police found Fiddler's bank card and clothing that may or may not have belonged to Fiddler. According to Jeffrey Kercheval, a Hagerstown Police Forensic Chemist, Fiddler's bank card was sent to the Federal Bureau of Investigation (FBI) laboratory for analysis.

During their investigation of Fiddler's murder, the Hagerstown Police received a certified copy of a vehicle registration which indicated that, in January 1989, appellant had purchased a Volkswagen Rabbit. In February 1989, Richard Miller bought the car from appellant for $50. Miller testified that the car's drive shaft was broken. He also maintained that the car had been sitting in his driveway for approximately two weeks before he purchased it. In April 1990, according to Miller, the Hagerstown Police came to him about the car and he took it to the Police Department. Detective William A. Baker stated that he towed the car from Miller's residence to the Police Department's Impound Lot. Miller testified that the police had the car approximately two months or longer. When the car was returned to him, the police had cut pieces, as big as quarters, out of the seat and the door. Miller drove the car a little longer, then junked it at Grimm's Junkyard.

The car was examined in the underground garage of the Hagerstown Police Department from April 19 through April 20, 1990. Kercheval testified that he removed a small stain

from the car and did a presumptive test for blood that proved positive. He then sent the sample away for DNA testing, but the results indicated that it was not suitable for testing. In April 1991, car parts, that had been sent to the FBI, were returned, stored in the evidence locker at the Hagerstown Police Department, and later put back on the car.

In April 1995, after Fiddler's body was exhumed, hair samples were obtained from the body and submitted to the FBI laboratory. Some of Fiddler's clothing and other items were also sent to the FBI for analysis. Hagerstown Police Detective Kenneth R. Sterner testified that, in October 1995, the car was retrieved again—this time from Grimm's Junkyard. Detective Sterner inspected the car and saw that the rear seat was missing. The FBI performed tests and it was determined that there was human blood in the car, but it could not be classified.

The FBI also analyzed fibers that had been lifted from Fiddler's right heel. The fibers exhibited the same microscopic characteristics as the white wool fibers composing the carpet from 12 Elizabeth Street. An FBI report indicated, however, that white wool fibers "pretty much all look alike."

Investigators had used hair from the hairbrush as the known standard from Fiddler. An FBI forensic scientist testified that a single hair found on the right passenger seat of the car was consistent with Fiddler's hair and the hair found on the rear bench seat of the car was also consistent with the hair from the same person. According to the witness, however, hair comparisons do not constitute a basis for absolute personal identification. There was evidence adduced at the trial that appellant claimed that Fiddler was never in his car and that he never lent his car to anyone.

Connie Minnich testified that, sometime in 1989, while partying on Jefferson Boulevard, she heard appellant tell her sister, whom he was dating at the time, that he "did not mean for it to go that far." She had also overheard conversations between appellant and Russell and between appellant and another man, in which appellant declared that he "did not

want it to go that far," and he just "freaked out." Appellant said that he did not know if Fiddler was dead, they were just scared; that they had to stop, get out and go to the trunk, because he was in the trunk, and that they pushed him out into the ditch. Appellant indicated to Minnich that they went out that night looking for Fiddler "to put a scare in him" because they thought he was a "narc."

At the time Minnich gave her statement to the Hagerstown Police, they promised her that they would give her $200 for her rent and they, in fact did after the statement. Detective Sterner testified that the $200 was given to Minnich approximately one month or one month and one-half after her statement was made, because she called and said that she was having trouble with her rent. According to Detective Sterner, the money was not given to her in exchange for her statement.

In July 1990, Brian L. Burchett was visiting his daughter, at her mother's house, on West Washington Street in Hagerstown where appellant, Russell, and other people had assembled. Burchett overheard appellant and the others talking about somebody deserving something and there was mention of a leather jacket, a stabbing, a beating, and throwing [someone] out of a car. Everyone was talking at the same time about a car, about "a throwing" out on the median strip, about a stabbing with a knife, and about the knife being thrown in the water. Appellant said Fiddler was "running his mouth too much" and that he "deserved what he got."

Richard Ford moved to Hagerstown, in 1990, and one day in the Square, appellant was bragging to him about "having kicked some guy's butt." Appellant said that he "beat the guy up" because "the guy was sticking his nose" where it did not belong. Ford indicated that appellant told him that appellant, Burral, Baltimore, and Schell "took the guy around the corner" and they "beat the living heck out of him." Appellant stated that he did not "give a damn if the guy lived or died" and that they put him in the van and dropped him on the interstate, at the state line. Ginger Eavey heard appellant say that he knew who murdered Fiddler, that it happened in

West End, and that the reason he knew how and where it happened, was because they did it. Although he did not tell her directly, appellant said that Fiddler's body was "dumped" along the state line.

Argo, Minnich, and Desjardins testified that, as they walked past the Hagerstown Police Department's Impound Lot, appellant told them that a car, covered with a blue tarp, was his. Argo related that appellant said that the police believed his car was used in a murder and, although Fiddler's name was not mentioned at the time, appellant told her that the police were trying to connect him to Fiddler's murder. Appellant also told Argo that the police could not prove anything because there was "no blood or anything in the car, it had been cleaned out."

Patricia Moore, who claimed that she lied in her statement to Detective Sterner because she was being coached and threatened with two felony charges, testified that she told the detective that she heard appellant talking about Fiddler's murder and that appellant was there that night. Moore told the detective that appellant helped beat Fiddler, that there was a struggle and Fiddler was trying to get away, and that is when they stabbed him at the field. Contrary to her testimony, Detective Sterner testified that Moore voluntarily came to the police station and he did not coerce her or threaten her, nor was he aware of any felony investigation of the witness.

Appellant told Desjardins, in February 1989 when she was in the Washington County Detention Center, that he had fought with Fiddler at Schell's apartment on Elizabeth Street. She stated that appellant said he had been in a car that night with Burral, Schell, and someone named "Sky." They were riding around looking for Fiddler to fight him and "to put a scare in him." Desjardins also overheard a telephone conversation between Schell and her husband, in which Schell indicated that he had stabbed someone.

Testifying for the defense concerning alleged statements made by Schell, Stephen Harris said that he walked downtown with Schell and Schell told him that he had stabbed someone

at his house. Roddy Pifer testified that, in 1990, when he was incarcerated with Schell, Schell said that he "had killed someone, wrapped them up in something, and dumped them along Interstate 81."

## ANALYSIS

## I

### A. Sufficiency of Evidence to Establish Criminal Agency

■ In urging us to find insufficient evidence to support his convictions, appellant initially attacks the lack of any evidence to "pinpoint the crime scene or establish appellant's actual involvement in the murder" and the State's reliance upon "general comments about the crime that anyone who listened to rumors or read the paper may have made." While it is true that the State's presentation was comprised of what appeared at times to be principally the scattered recollections of a local clique in the small Hagerstown community, it was only because the prosecution was forced to prove its case through accounts of hostilities observed between the victim and his assailants that were a prelude to the killing, and witnesses who were reluctant—in certain instances actually recanting prior statements incriminating appellant, as was the case with Patricia Moore.

■ The test for evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime, beyond a reasonable doubt. *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336 (1994). We examine whether the admissible evidence adduced at trial showed directly or supported a rational inference of the facts to be proved, from which the jury could be convinced, beyond a reasonable doubt, of the accused's guilt. *Thomas v. State*, 32 Md.App. 465, 476, 361 A.2d 138, *cert. denied*, 278 Md. 736 (1976).

■ As long as there was legally sufficient evidence by which the jury could be convinced of the accused's guilt

beyond a reasonable doubt, we will not disturb its verdict on appeal. *Wilson v. State*, 261 Md. 551, 556, 276 A.2d 214 (1971). In other words, a guilty verdict may be set aside only if there is no legally sufficient evidence or inferences drawable therefrom on which the jury could find the accused guilty beyond a reasonable doubt. *Barnes v. State*, 31 Md.App. 25, 29, 354 A.2d 499 (1976).

Notwithstanding appellant's assertion that the testimony represented general comments that were common knowledge in the Hagerstown community, these statements were specifically attributed to appellant, who was reported by Moore to have said "he got like a thrill, a rush," that his knuckles were red and swollen from beating the victim, that appellant "figured well the cops aren't going to know about it [because] they were like total jerks," that appellant and two others tried to scare the victim "because of [sic] they was [sic] really into drugs," that "they stabbed him there at the field ... there was [sic] spots of blood in the back of the trunk" of appellant's car, and that "it was easy. And I got away with it."

The statement of Ford recounted, "[a]nd ah Eddie [appellant] and his girlfriend came up to us and all and he started talking about it like it's no big deal I killed the fucking guy, you know," and "so Mickey Baltimore and Bobby Starr and that other guy killed his fucking ass and threw him along the park road." Kogar and Russell had talked about something that "got out of hand" (apparently referring to the fact that Fiddler's killers simply wanted to scare him). Appellant told Minnich that "he just freaked out and Jeff wound up getting stabbed," that they put the victim in the trunk; "[appellant] did not know if he was dead or not"; "[appellant] and his cohorts were 'hyped up' and 'just left him.' " Tobery told the police that "they were fighting him and putting a scare into him" and that "[appellant] had told her Billy, Bobby, and Sky were in the car with him." Tobery also told the police that she saw appellant and others chasing Schell through the town square after the murder and appellant, according to Tobery, was yelling "mother fucker you say anything ... and I'll

knock your teeth out" (ostensibly referring to reporting the circumstances of Fiddler's killing to anyone).

Burchett testified that he overheard appellant talking with others about the murder, saying that "Jeff Fiddler was running his mouth too much and that he did deserve what he got." Finally, Argo asserted that appellant told her that the police could not prove anything about the murder and that "there was blood in there [referring to his car] but it's been cleaned out."

■ It is doubtful that all of the above statements attributed to appellant could be categorized—as appellant suggests—as "general comments about the crime that anyone who listened to rumors or read the paper may have made." They are, empirically, accounts of the witnesses' firsthand impressions, subject to cross-examination as to the witnesses' motives and biases in making the statements to the police or testifying as they did before the jury. Secondly, certain of the matters testified to would have been known only by the witnesses, rather than the general public. Moreover, much of the argument presented by appellant goes to the weight of the evidence and the credibility of the witnesses, which were properly resolved by the fact-finder at trial. Finally, it is of no consequence that certain matters testified to were also reported in the media, so long as the statements attributed to appellant were offered by the witnesses under oath. The manner of recovery of the body as well as the manner of death and physical evidence adduced at trial were more than sufficient to satisfy the legal requirement that the admissions attributed to appellant by the State's witnesses be corroborated. *See Miller v. State*, 251 Md. 362, 247 A.2d 530 (1968); *Franklin v. State*, 8 Md.App. 134, 258 A.2d 767 (1969).

Appellant, citing *Hebron v. State*, 331 Md. 219, 224, 627 A.2d 1029 (1993), reminds us "[t]hat a conviction upon circumstantial evidence alone will not be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence." He insists that the most compelling of the "numerous reasonable hypotheses consistent with inno-

cence" generated by this case is that Schell was the murderer. In discussing *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990) and *West v. State,* 312 Md. 197, 539 A.2d 231 (1988), Robert M. Bell, currently the Chief Judge, speaking for the Court of Appeals in *Hebron* noted:

> The cases referring to circumstantial evidence not excluding every reasonable hypothesis of a defendant's innocence are cases in which there is circumstantial evidence of the defendant's guilt and other evidence, either circumstantial or direct, tending to negate that evidence and no basis upon which a rational finder of fact could return a verdict of guilty without speculating as to which of the two versions is the correct version. A jury faced with that state of the evidence could not logically nor lawfully, return a guilty verdict; hence as the Court of Special Appeals pointed out, given that scenario, "there is nothing for the jury to decide and, upon proper motion, the judge is duty-bound as a matter of law, to enter a judgment of acquittal."

It should be noted that *Wilson* and *West* involved defendants who had access to stolen property and who attempted to cash a stolen money order, respectively. The Court of Appeals made clear that "critical to the resolution of both *Wilson* and *West* was the constitutional standard of review for sufficiency of evidence." *Hebron,* 331 Md. at 231–32, 627 A.2d 1029. Moreover, the Court concluded that applying the reasonable hypotheses of innocence "is not only unwarranted, but improper" when the circumstantial evidence consists of more than a single strand because, in such case, the circumstances, taken in view from the State's perspective, are *inconsistent* with, although not absolutely dispositive of the defendant's innocence. *Id.* at 228, 627 A.2d 1029.

Based on the foregoing, we have in this case much more than a single strand of circumstantial evidence. Indeed, unlike *West* and *Wilson,* appellant's convictions were not based on the inference flowing from the possession of stolen goods that the possessor was the thief or the robber. While many of

the witnesses provided the circumstantial backdrop for the fatal assail, the admissions attributed to appellant, if believed, are more in the nature of direct evidence.

Finally, the record is replete with testimony that the beating and stabbing were committed by appellant with the aid and assistance of at least three other cohorts. Thus, a conclusive showing that Schell was involved would not exculpate appellant from the role he played in the killing of Fiddler. That the evidence establishes appellant's criminal agency for the crimes of premeditated murder, at worst, and a classic case of depraved-heart second degree murder,[1] at best, is for

---

1. The trial judge submitted to the jury and charged it accordingly as to premeditated first degree murder, felony murder and second degree murder. The indictment against appellant did not include a count charging manslaughter. Robert C. Murphy, (formerly Chief Judge of the Court of Appeals), specially assigned, speaking for this Court in our recent decision in *Cook v. State*, 118 Md.App. 404, 702 A.2d 971 (1997), citing *Robinson v. State*, 307 Md. 738, 744–45, 517 A.2d 94 (1986), distinguishing between depraved-heart second degree murder and involuntary manslaughter, defined depraved-heart second degree murder thusly:

 It ["depraved heart" murder] is the form [of murder] that establishes that the wilful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself. This highly blameworthy state of mind is not one of mere negligence.... It is not merely even one of gross criminal negligence.... It involves rather the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.

 . . .

 A depraved heart murder is often described as a wanton and wilful killing. The term "depraved heart" means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes the behavior as wanton.

 The actions of Stouffer and his accomplices clearly constitute dangerous and reckless acts with wanton indifference to the consequences and perils involved. *See also Williams v. State*, 100 Md.App. 468, 482, 641 A.2d 990 (1994). We note that the indictment charged several sex offenses, including sodomy. At trial, however, no evidence was adduced to sustain these charges and we may not consider a theory of the State's case that was neither advanced nor proven.

us a facile decision. The jury, however, returned convictions for felony murder and kidnapping.

## B. Sufficiency of the Evidence to Establish Elements of the Kidnapping and Felony Murder

■ In claiming an insufficiency of the evidence to sustain the kidnapping conviction, appellant asserts that the State presented conflicting evidence that the victim "voluntarily left a bar with appellant, Jimmy Russell, Billy Burral, and Bobby Schell or that appellant claimed that Jeffrey's body was in the trunk of a car, or that Jeffrey was beaten and placed in a van." In addition to appellant's contention that there was no evidence the victim was forcibly carried away, he also asserts that the evidence fails to show that Fiddler was alive at the time that his body was transported to Pennsylvania. In support of this proposition, appellant cites the medical examiner's testimony that the victim would have bled to death from his wounds within one-half hour of the time they were inflicted. The small amounts of blood found in the car and the utter lack of evidence about any crime scene other than 12 Elizabeth Street, according to appellant, compels the conclusion that Fiddler was not alive at the time his body was transported.

The State, in turn, alludes to the evidence that the victim in all probability did not die immediately from his wounds but probably died one-half hour after the wounds were inflicted; that the stabbing did not take place where the body was found; and that the victim was partially redressed after the stabbing and dragged down into the ditch where he was left. The State also refers us to the testimony of Ford, who said that "they beat the heck out of him and didn't give a damn if he lived or died and said that he ... that they put in the van [sic] and dropped him off at the interstate right there at state line."

Our task, as we see it, is initially to determine whether the evidence supports the conviction for kidnapping and, secondly,

whether the homicide in this case was committed in the perpetration of the underlying felony, i.e., kidnapping.

In Maryland, kidnapping is one of the predicate offenses for felony murder, set out in MARYLAND CODE (1957, 1996 Repl. Vol.), art. 27, § 410:

All murder which shall be committed in the perpetration of, or attempt to perpetrate ... kidnapping as defined in §§ 337 and 338 of this article ... shall be murder in the first degree.

Kidnapping is proscribed by MARYLAND CODE (1957, 1996 Repl.Vol.), art. 27, § 337, which provides that

every person, ... convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person, ... with intent to have such person carried out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony....

At common law, kidnapping was the forcible abduction and carrying away of a man, woman, or child from his or her own country into another. CLARK & MARSHALL, LAW OF CRIMES § 10.23 (7th ed.1967); 4 W. BLACKSTONE, COMMENTARIES 219. We further explained in *Tate and Hall v. State,* 32 Md.App. 613, 615–16, 363 A.2d 622 (1976):

It is an aggravated form of false imprisonment, embracing all of the elements of that offense and adding to it an asportation of the victim out of his own country. *See Hunt v. State,* 12 Md.App. 286, 310, 278 A.2d 637, *cert. denied,* 263 Md. 715 (1971); PERKINS, CRIMINAL LAW 176 (2d ed.1969). The principal source of the aggravation lies in the carrying of the victim beyond the protection of the laws of his country. *See* 1 R. ANDERSON, WHARTON'S CRIMINAL LAW AND PROCEDURE § 371 (1957).

We further noted in *Tate and Hall* that the determinative element under § 337 is the "carrying" itself, rather than "an abduction, a forcible carrying away." *Id.* at 616, 363 A.2d 622. We ultimately concluded that

[i]n sum, whatever might be said of the common law offense, it is apparent, in light of the changes wrought by § 337, that the gist of the offense of kidnapping in Maryland is unlawful confinement coupled with transportation of the victim. *Cf. Collier v. Vaccaro*, 51 F.2d 17, 19 (4th Cir.1931). The initial assaultive taking of the person and the carrying out of the state required at common law are not part of the § 337 offense.

Applying the above principles to the instant case, appellant, Burral, Baltimore, and Starr sought to inflict grave injury upon Fiddler for the purpose of intimidating him. Varying accounts indicate that he was "sticking his nose where it didn't belong" or that he was a "narc." Regardless as to why this bellicose band sought to intimidate the victim, the record clearly does not show any particular design to "carry" Fiddler from one location to another.[2] In a word, inflicting bodily injury and, ultimately, when things "went too far," concealing and disposing of the body were their two goals.

Nevertheless, we need not concern ourselves with the reason or motive for any movement of Fiddler at a point in time when he was still alive, since kidnapping, under Maryland law, is accomplished, as noted, once there is "confinement coupled with transportation of the victim."

In that regard, Ford testified:

---

**2.** WHARTON'S CRIMINAL LAW AND PROCEDURE, Vol. I, (1957), describes the requisite *mens rea* in § 372:

Under those statutes which define kidnapping as the doing of an act, such as detaining, independently of a further purpose such as to obtain ransom, the criminal intent is the intent to do the act prohibited. It is only necessary to show that the defendant voluntarily committed the prohibited act.

When the prohibited act must be done with a particular purpose or desire, such as to obtain ransom, it is necessary to show that the defendant did have the specific intent to detain the victim for that purpose when he committed the act of detaining.

WHARTON explicates further in § 373:

Under many statutes the fact of unlawful detention or transportation of the victim is the act which constitutes kidnapping, even though the purpose for so doing is not known or proved at the trial.

[PROSECUTOR]: Did he mention anything about what they did with the person?

[WITNESS]: Well the way I have been told and everything. . . .

[PROSECUTOR]: Now from [appellant] sir.

[WITNESS]: From [appellant].

[PROSECUTOR]: Uh huh.

[WITNESS]: He told me that they *took him around the corner* and beat the living heck out of this guy.

[PROSECUTOR]: Did he mention what corner?

[WITNESS]: Right . . . he didn't really mention what corner but it was right around the corner of Rocky's.

[PROSECUTOR]: Around the corner of Rocky's is that where you understood him to refer to?

[WITNESS]: In the alleyway.

[PROSECUTOR]: Is that what you're saying?

[WITNESS]: Yeah.

[PROSECUTOR]: Okay. What else did he tell you?

[WITNESS]: He just said that they beat the heck out of him and didn't give a damn if he lived or died and said that he . . . *that they put [sic] in the van and dropped him off at the interstate right there at State Line.*

[PROSECUTOR]: Did he tell you who else was present when this happened Mr. Ford?

[WITNESS]: The way I understand it was supposed to be him [appellant], Billy Burral, Mickey Baltimore and Bobby Starr.

Appellant argues, however, that when Fiddler accompanied his assailants around the corner, it could have been voluntary and that the evidence fails to show that he was alive when he was transported in the van to the Pennsylvania State line. It can reasonably be inferred from the totality of the circumstances, including all of the hostilities leading up to the confrontation at Rocky's, that Fiddler did not go willingly and, the fact that the physical evidence indicated the onset of death occurred over a period of one-half hour as a result of excessive

bleeding would give rise to an inference that Fiddler was still alive when he was placed in the van and driven to the Pennsylvania State line.

More cogently, however, the statement of Moore, who had attempted to recant what she told the police, was received as substantive evidence at trial. She testified:

[PROSECUTOR]: And then he asked you, "He [appellant] said that *he was riding around in the car with him [Fiddler] that night?*" Your answer, "Yeah he was there that night." Is that what your answer was?

[WITNESS]: Yes but I didn't know that.

[PROSECUTOR]: And then Detective Sterner said, "Okay did he [appellant] say about that Jeff got beat up?" And your answer, "Yeah Jeff had gotten beat up because he was a part of it because his knuckles, he said his knuckles were red and swollen and stuff." Do you remember saying that to Detective Sterner?

[WITNESS]: Yes.

[PROSECUTOR]: And then you were asked, "So [appellant] helped beat him [Fiddler] up because he said his knuckles were sore?" And your answer was, "Yes."?

[WITNESS]: Like I said I was talked into that.

[PROSECUTOR]: And then you volunteered, "He [appellant] said there was a struggle *and he was trying to get away a couple of times.*" Jeffrey Fiddler was trying to get away. Officer Sterner said, "Okay." And you said, "That's where they stabbed him there at the field." Remember saying that to Detective Sterner?

[WITNESS]: Yes.

From the above, appellant had told Moore that he was riding around with the victim that night and that there had been a struggle during which Fiddler was attempting to escape. It is inexorably pellucid from the latter excerpt that (1) Fiddler was still alive and (2) he sought to escape indicating confinement against his will subsequent to being transported to the field where he was stabbed.

■ We next turn to the question that is more problematic, i.e., was the homicide in this case committed in the perpetration of a felony? Although we have noted, citing *Tate and Hall, supra,* that unlawful confinement coupled with transportation of the victim is sufficient to constitute kidnapping under § 337 of art. 27, substitution of the felony for the elements of premeditation and malice to sustain a first degree murder conviction presents a different question from a determination of the requisite intent to sustain a conviction for kidnapping. Specifically, while the intent under the Maryland kidnapping statute has been held to be proven so long as the act is intentional, the critical question, based on the rationale undergirding felony murder, is whether the homicide occurred because of the particular criminal event undertaken. As we said in *Higginbotham v. State,* 104 Md.App. 145, 152, 655 A.2d 1282 (1995), citing *Butler v. State,* 91 Md.App. 515, 523, 605 A.2d 186 (1992),

> [t]he murderous *mens rea* under [the theory of felony murder based on armed robbery] does not entail any intent to kill at all but only the intent to perpetrate the underlying felony. . . . Second-degree murder, by contrast, requires the specific intent either to kill or to commit grievous bodily harm against the victim.

Moreover, the Court of Appeals opined in *Campbell v. State,* 293 Md. 438, 445–46, 444 A.2d 1034 (1982), citing *Commonwealth v. Redline,* 391 Pa. 486, 495–96, 137 A.2d 472 (1958):

> The mere coincidence of homicide and felony is not enough to satisfy the requirements of the felony-murder doctrine. "It is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony.["]

> . . .

> [I]n order to convict for felony-murder, the *killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.*

· Although *Campbell* dealt with the culpability of a felon for the death of his co-felon during the perpetration of a robbery, and although the case discussed, at length, applying a proximate cause theory to the felony-murder doctrine, *Campbell* is instructive in that it makes clear the requirement that the felony be more than incidental to the homicide.

More apropos to the issue presented *sub judice,* we discussed the nexus required between the homicide and the underlying felony in *Jackson v. State,* 87 Md.App. 475, 488, 590 A.2d 177 (1991):

As Wharton said in his classic treatise, in order for felony murder to apply, the killing: "must have been done in pursuance of the unlawful act, and not collateral to it. The killing must have had an intimate relation and close connection with the felony, and not be separate, distinct, and independent from it.... The death must have occurred *as a result or outcome of the attempt to commit the felony.*" WHARTON, HOMICIDE § 126 (3d ed.1907) at 184.

In no sense can Fiddler's death be viewed as the "result or outcome" of a kidnapping that appellant and his bellicose band intended to perpetrate.

An excerpt from LAFAVE most succinctly and precisely depicts the causation required between the homicide and the underlying felony:

In short, whether there is a sufficient causal connection between the felony and the homicide depends on whether the defendant's *felony dictated his conduct* which led to the homicide. If it did, and the matters of time and place are not too remote, the homicide may be "in the commission of" the felony; but if it did not, it may not be.

LAFAVE & SCOTT, CRIMINAL LAW (2d ed.1972).

Applying the LAFAVE test to the instant case, could it be said that the kidnapping "dictated" appellant's conduct that led to the victim's homicide? The kidnapping neither dictated the conduct of the assailants nor was it what they intended to accomplish nor was the kidnapping more than incidental to the course of events of the morning of February 27, 1989.

Kidnapping is most often associated with other crimes against person as in the case of extortion. Maryland, unlike some other states,[3] does not require a pecuniary objective or goal or any other reason or motive in order to sustain a conviction for kidnapping.

■ We have scoured the record and invited counsel to direct our attention to any evidence that would demonstrate that appellant and his cohorts set out, in the early morning hours of February 27, 1989, to kidnap Jeffrey Fiddler. Citing *Graham v. State,* 325 Md. 398, 416, 601 A.2d 131 (1992) and *Anthony v. State,* 117 Md.App. 119, 126, 699 A.2d 505 (1997), the State objects to any consideration of whether there is evidence that the homicide was committed "in the perpetration of Fiddler's kidnapping" because "Stouffer did not challenge, directly or even indirectly, the sufficiency of the evidence" in that regard in support of his motion for judgment of acquittal. Appellant's counsel argued to the court at the conclusion of all of the evidence in the case:

> Secondarily, your Honor, there's no indication that he engaged in conduct to inflict any serious bodily harm on the victim in this case. There's no indication of . . . that there was a *kidnapping* in this case. *This also relates to the*

---

3. WHARTON discusses statutes requiring a particular purpose at §§ 371 and 373:

> Kidnapping is generally regulated by statute and is variously defined as detaining, secretly confining, imprisoning, or transporting a person against his will and without authority of law, detaining for the purpose of obtaining a ransom or extorting money in order to secure a release, detaining to torture or commit a felony, or to commit robbery or a felony, or taking from an institution. In some states, detention or confinement for the purpose of compelling the victim to label or to sell his services as a slave constitutes kidnapping.
>
> . . .
>
> Many states also have statutes which add the requirement that the kidnapping be for the purpose of effecting or committing some other act, such as a robbery, a felony, or to obtain or extort a ransom or other pecuniary gain. Under such statutes, the same act which constitutes kidnapping under the simpler statute should also constitute the criminal act, that is, a mere unlawful detention of the victim should constitute the criminal act under a ransom kidnapping statute as well as under a mere detention kidnapping statute.

*felony murder ... to establish the felony murder.* No indication that he participated in the kidnapping of Jeffrey Lynn Fiddler.

We believe the above assertion that there was no kidnapping "to establish the felony murder" sufficiently preserves the issue for our consideration.

The State next discusses several cases that only tangentially address the question here presented. In its argument that the evidence "was sufficient to support the jury's reasonable determination that the killing was committed in the perpetration of the kidnapping," the State ultimately acknowledges that all of these cases[4] involved some issue regarding the defendant's liability under the felony-murder doctrine for a killing performed by a third party. The State next discusses *Jackson v. State, supra,* in which we upheld the felony-murder conviction of Jackson who was a suspect in the rape of the murder victim's mother. There, we held that the jury could properly find that Jackson had shot the victim in an attempt "to prevent the cessation of the fire," and thus that the shooting was in furtherance of the arson. The State's discussion of *Jackson* is precisely the point—that there is no evidence that Fiddler's homicide was in furtherance of the kidnapping.

■ While the presence or absence of causation in felony murder is generally a question of fact for the jury, *Jackson,* 87 Md.App. at 489, 590 A.2d 177 citing *Mumford v. State,* 19 Md.App. 640, 644, 313 A.2d 563 (1974), we do not believe the present controversy is such a case. Where, as in *Jackson,* there was evidence from which the fact-finder could infer commission of the homicide (the fatal shooting) was in furtherance of the underlying felony, prevention of thwarting the arson by shooting the inhabitant before she could obtain

---

4. *Mumford v. State,* 19 Md.App. 640, 313 A.2d 563 (1973): *Jackson v. State,* 286 Md. 430, 443–44, 408 A.2d 711 (1979); *Fowler v. State,* 79 Md.App. 517, 529–30, 558 A.2d 446, *cert. denied,* 317 Md. 392, 564 A.2d 406 (1989); *Scott v. State,* 49 Md.App. 70, 73–74, 430 A.2d 615 (1981); *Campbell v. State,* 293 Md. 438, 451, 444 A.2d 1034 (1982).

assistance was properly a question of fact as to Jackson's motivation. The question is not for the jury when it is not in the commission of the felony as a matter of law. *See* LaFave & Scott, Criminal Law § 7.5(f) (2d ed.1986) at 636 n. 98. Faced with no evidence of an intent to perpetrate a kidnapping, felony murder based on kidnapping as the underlying felony as a matter of law should not have been considered by the jury.

The State finally seeks solace in *Stebbing v. State,* 299 Md. 331, 473 A.2d 903, *cert. denied* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), *Higginbotham v. State,* 104 Md.App. 145, 157–58, 655 A.2d 1282, *cert. denied,* 339 Md. 642, 664 A.2d 886 (1995), and *Ball v. State,* 347 Md. 156, 184–89, 699 A.2d 1170 (1997). *Ball,* a capital murder case, discusses only the question of whether robbery is committed if the force used occurs after the asportation of property. *Stebbing,* another capital murder case, decided the narrow question that if force results in death, a taking and asportation after death is nevertheless robbery. Likewise, although *Higginbotham* did involve felony murder, the narrow issue there was whether the formation of the intent to rob subsequent to the force that caused the victim's death would sustain the murder conviction if the force also constituted an element of the robbery. The State misses the point. These cases are concerned only with contemporaneity of the occurrence of the requisite element of the offense of robbery and, in the case of *Higginbotham,* whether an element that caused the homicide may also be a component of the underlying felony.

In our determination of whether the homicide was committed in the perpetration of the underlying felony, we are not concerned with the point in time at which the intent to commit the underlying felony was formed. Rather, we consider dispositive whether the overarching intent—which we shall refer to with a capital "I"—driving the criminal enterprise is the intent essential to the underlying felony or the intent which is the *mens rea* of the resulting homicide, regardless of whether the intent is formed before or after the homicide. Conceptually, when this Intent coincides with the requisite intent of the

underlying felony, the resulting homicide is felony murder. The corollary, of course, is that where that Intent coincides with the *mens rea* of the homicide, the homicide is not felony murder.

■ Where the Intent or the principal mission of the criminal venture hinges on a factual determination of the primary goal of the criminal agent, the question must be submitted to the jury. There was no direct or inferential evidence before the trier of fact that the announced purpose of Stouffer's mission—to scare Fiddler—was to be accomplished by forcibly confining and transporting him. All of the evidence indicates that the means to be employed in intimidating Fiddler or placing him in fear as a consequence of him being a "narc" or "sticking his nose where it didn't belong" was the infliction of serious bodily harm in a reckless and dangerous manner with indifference to the consequences, i.e., as Stouffer reportedly said, "I do not give a damn if the guy lived or died."

The felony-murder rule was conceived at common law to relieve the State of its obligation to prove an intent to kill when a felon embarked on a dangerous course of conduct which, because of that conduct, resulted in death. An unintended homicide, in other words, becomes the equivalent of first degree murder under such circumstances if the felon is proved to have committed the homicide. The rationale was to dissuade one from engaging in a dangerous course of conduct whereby a greater harm might logically result; it was not the object to dissuade a course of conduct, the aim of which was to inflict great bodily injury from resulting in a far lesser harm.

■ The felony must be a *sine qua non*, i.e., but for the felony, the deceased would not have been killed. *See* PERKINS & BOYCE, CRIMINAL LAW (3d ed.1982) at 67. In their treatise, Perkins and Boyce illustrate, positing one case in which a dwelling was broken into at night for the purpose of killing the dweller. The homicide under these circumstances is not felony murder. By contrast, if one embarks on a burglary, intending to steal goods within the dwelling, and is surprised by the owner thereof and then shoots the owner, the homicide

would be felony murder. In the first instance, we have a burglary in the perpetration of a homicide (not felony murder) and, in the second instance, the resultant homicide is felony murder.

Applying the above illustration to the instant case, there was no evidence from which one could conclude that Fiddler's death was an unintentional killing that resulted from the decision of appellant and his cohorts to kidnap him.

The Supreme Court of Wyoming described the felony-murder principle succinctly in *Bouwkamp v. State*, 833 P.2d 486, 492 (Wyo.1992), holding that

... the purpose of the [felony murder] rule is to deter homicides in the course of felonies, including those resulting from negligence or accident, by holding the perpetrators strictly responsible. This purpose does not logically reach the circumstance where the felony is conceived of and executed after the killing has occurred.... Perpetration as used here, is the act or process of commission of a specified crime. *Webster's Third New international Dictionary* 1684 (1971). To occur in the perpetration of a felony the killing must occur in the unbroken chain of events comprising the felony. In *Cloman [v. State*, 574 P.2d 410 (Wyo.1978)] we framed the concept this way: "the time sequence is not important as long as the evidence, including the inferences, point to one continuous transaction." This means that, for a finding of felony murder, *the killing must occur as part of the res gestae or "things done to commit" the felony.* If the felony was not conceived of before the victim's death but occurs after the murder, the chain is broken and the murder is a separate act which cannot have occurred in "the perpetration of" the underlying felony. *While the sequence of events is not significant, their interrelationship is. A specific connection is required: the murder must occur in the performance of the felony for conviction of felony murder* under Wyo. Stat. § 6–2–101 (June 1988).

Likewise, the Court of Appeals of Michigan, in *People v. Goddard*, 135 Mich.App. 128, 352 N.W.2d 367, 370–71 (1984), *rev'd on other grounds*, 429 Mich. 505, 418 N.W.2d 881 (1988):

Courts have usually required that the killing and the underlying felony be "closely connected in point of time, place and causal relation." The required relationship between the homicide and the underlying felony has been summarized as being "whether there is a sufficient causal connection between the felony and the homicide depends upon *whether the defendant's felony dictated his conduct which led to the homicide.*"

We hold that, to qualify as felony murder, *the homicide must be incident to the felony and associated with it as one of its hazards.* It is not necessary that the murder be contemporaneous with the felony. A lapse of time and distance are factors to be considered but are not determinative. *Defendant must intend to commit the felony at the time the killing occurs.*

(Citations omitted.)

In sum, at common law and under current statutory law, the conduct engaged in by appellant and his cohorts, where they deliberately set out to find Fiddler for the express purpose of inflicting grave physical harm upon him, is proscribed in precise terms. Felony murder, on the other hand, was a fiction created by the common law wherein the felon is deemed to have intended the consequences, i.e., a homicide, of his felonious acts even though those consequences clearly were not intended.

Simply put, felony murder *is* an alternative theory to first degree premeditated murder and can only apply when it is demonstrated that the homicide is a by-product of the intended act. Where grave bodily injury or homicide is the intended act and the felony is merely an incidental afterthought, felony murder is not committed.

## II

Appellant next contends that the trial court, on several occasions, "sustained the State's objections to cross-examination questions which tended to implicate someone else in the murder of Jeffrey Fiddler." In the following colloquy, counsel

attempted to examine Connie Minnich about her relationship with Michael Baltimore:

[DEFENSE COUNSEL]: You have a boyfriend or did have one Michael Baltimore, is that correct?

[WITNESS]: Yes.

[DEFENSE COUNSEL]: He was also charged with the crime, wasn't he?

[WITNESS]: Yes he was.

[DEFENSE COUNSEL]: And he said he was there, didn't he?

[WITNESS]: Yeah he did.

[DEFENSE COUNSEL]: Okay.

[PROSECUTOR]: Objection.

[THE COURT]: Sustained. The jury will disregard the answer to that question.

Appellant asserts that, when he was questioning the witness about her relationship with Baltimore, who was also charged in the case, the evidence was relevant to the witness's credibility and bias. The question on its face, according to the State, calls for hearsay. The short answer to appellant's contention is that evidence that Baltimore had been the witness's boyfriend and that Baltimore had been charged with the crime had been brought to the jury's attention. Additionally, evidence that Baltimore said he was at the murder scene would not necessarily demonstrate bias on behalf of the witness.

Next, appellant contends that Sergeant Graves was prevented from disclosing what the investigation had revealed about Baltimore's involvement in the offense:

[DEFENSE COUNSEL]: Alright. Now you also interviewed a Michael Baltimore, did you not?

[WITNESS]: Yes sir I did.

[DEFENSE COUNSEL]: Alright. And how did you first interview Michael Baltimore?

[PROSECUTOR]: Your Honor I object. Relevance.

[THE COURT]: Are you attempting to produce through this witness a statement made by Michael Baltimore?

[DEFENSE COUNSEL]: Just what happened with the investigation regarding Mr. Baltimore.

[PROSECUTOR]: I don't see how that's relevant, your Honor.

[THE COURT]: Sustained.

Appellant maintains that the evidence was relevant in that it would elicit additional facts regarding the reliability of the investigation, as well as the bias of the witness who admitted that Baltimore had been her boyfriend. Appellant never raised any of these arguments in a proffer to the court, nor was anything presented demonstrating how the investigation of Baltimore was unreliable or how the credibility of the witness who had dated Baltimore could be impeached by the line of questioning.

Finally, appellant contends that Detective Sterner should have been allowed to testify to an alleged payment of money to Baltimore:

[DEFENSE COUNSEL]: Now you indicate there was . . . however there was money paid to one of the witnesses in this case, correct, Connie Minnich?

[PROSECUTOR]: Objection your Honor beyond the scope.

[THE COURT]: Overruled. I'll permit it.

[DEFENSE COUNSEL]: Thank you sir. Is that correct?

[WITNESS]: Yes.

[DEFENSE COUNSEL]: Alright. And was money paid to another witness, a Michael Baltimore?

[PROSECUTOR]: Objection your Honor.

[THE COURT]: Sustained.

Appellant avers that the evidence would "place the police investigation in context" and show the bias of the police, in putting together their case against him. There never was any proffer establishing why such evidence was relevant. More importantly, Baltimore never testified; therefore, his bias was not in issue.

The scope of cross-examination, as provided by MARYLAND RULE 5–611(b)(1), is as follows:

(1) Except as provided in subsection (b)(2), cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Except for the cross-examination of an accused who testifies on a preliminary matter, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

 We have held that the right to cross-examine a witness is not absolute; it may be restricted by the trial judge. *Leeks v. State,* 110 Md.App. 543, 554, 678 A.2d 80 (1996). The allowance of questions on cross-examination and determination of their relevance are reserved for the sound discretion of the trial court. *Waldron v. State,* 62 Md.App. 686, 696, 491 A.2d 595, *cert. denied,* 304 Md. 97, 497 A.2d 819 (1985). The trial court must balance probative value of the inquiry against unfair prejudice that might inure to the witness. *State v. Cox,* 298 Md. 173, 178, 468 A.2d 319 (1983). The court, in engaging in the balancing test, shall "give wide latitude to the [cross-examination] for bias or prejudice but not permitting the questioning 'to stray into collateral matters which would obscure the trial issues and lead to the fact[ ]finder's confusion." *Ebb v. State,* 341 Md. 578, 588, 671 A.2d 974 (1996). Only upon a showing of prejudicial abuse of discretion will the trial court's decision be disturbed on appeal. *Nottingham Village, Inc. v. Baltimore County,* 266 Md. 339, 356, 292 A.2d 680 (1972). There has been no such showing by appellant. Therefore, we will not disturb the trial court's decision.

## III

Appellant argues that the court erred by allowing the State to admit prior statements of witnesses, "under the guise of refreshing recollection or impeachment." Appellant directs our attention to the testimony of Desjardins and asserts that she was not asked to testify about her recollection of events. Rather, appellant contends, under the appearance of refreshing recollection or impeachment, that she was asked to confirm the statement she made to the police. Appellant also

asserts that the use of the witness's prior statement was improper because the State failed to lay the proper foundation for the admission of a prior inconsistent statement, since the witness had not claimed either that she had no present recollection of the event or that she could not remember the statement. The State, he says, asked the witness questions about her statement to the police, when she had not made a statement inconsistent with the one she gave the police and the witness admitted to making the statement and was trying to answer the State's questions with regard to the statement.

We have opined that "present recollection revived . . . is the use by a witness of some writing or other object to refresh his [or her] recollection so that he [or she] may testify about past events from present recollection." *Askins v. State,* 13 Md. App. 702, 710, 284 A.2d 626 (1971), *cert. denied,* 264 Md. 745 (1972). "Whether a party may use a writing or other object to refresh the failing memory of a witness lies within the sound discretion of the trial court." *Butler v. State,* 107 Md.App. 345, 354, 667 A.2d 999 (1995). If, while testifying, a witness uses a writing or other item to refresh memory, MARYLAND RULE 5–612 provides that "any party is entitled to inspect it, to examine the witness about it, and to introduce in evidence those portions which relate to the testimony of the witness for the limited purpose of impeaching the witness as to whether the item in fact refreshes the witness's recollection."

We disagree with appellant. It was not until after the witness said that she could not remember material facts about a telephone conversation between herself and appellant, that the State introduced her prior statement to refresh her recollection about the conversation. Thereafter, since the witness was using the statement to refresh her recollection, either party had the right to examine her about it and the State did so on occasions when the witness gave inconsistent testimony. Clearly, the court had the discretion to allow the statement to be used for that purpose and we, therefore, hold that there was no showing of an abuse of discretion.

## IV

 Tobery's testimony, argues appellant, about alleged threats made by him to Schell should not have been allowed, because such testimony was received as substantive evidence that Schell was threatened by appellant and, therefore, constituted hearsay rather than admissions. The State contends that the witness testified to both hearing appellant make the threat and also having no personal knowledge of the matter; therefore, the court did not err by allowing her testimony, in order that the jury could resolve which version was the truth.

On direct examination, Tobery had indicated that she had not been present when appellant chased Schell. Upon being confronted with her statement to the police, the following transpired:

> [PROSECUTOR]: And when this chase was taking place when it was going on did you hear the [appellant] talking?
>
> [WITNESS]: There were so many people yelling. I can't remember. I can't remember if he was yelling or....
>
> [PROSECUTOR]: Let me again refer you to your statement.
>
> . . .
>
> [PROSECUTOR]: And your response?
>
> [WITNESS]: Yes I remember this.
>
> [PROSECUTOR]: *You heard that?*
>
> [WITNESS]: Yes.
>
> [PROSECUTOR]: *And what did the [appellant] say? What was the [appellant] hollering?*
>
> [WITNESS]: That he was tired of it. I need to look. I'm nervous.
>
> [PROSECUTOR]: Would you read your response?
>
> [WITNESS]: Okay. Right here?
>
> [PROSECUTOR]: Yes. Read it out loud.
>
> [WITNESS]: "He kept telling...."
>
> [DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

[WITNESS]: j"He was saying...."

[PROSECUTOR]: Wait a minute. Start over. Now.

. . .

[PROSECUTOR]: Read it out loud to the jury.

. . .

[PROSECUTOR]: Where it says he. It starts there.

[WITNESS]: Okay. "He kept telling ... he said, 'Mother-fucker you say anything,' he said 'and I'll knock your teeth out.' He said, 'I don't care. I'm tired of it. I'm tired of it.' And Eddie went to hit him and Bobby took off running."

[PROSECUTOR]: Okay now that ... the he that you refer to first is the [appellant], Eddie Stouffer?

. . .

[PROSECUTOR]: He said, "What was Eddie saying during this?"

[WITNESS]: Okay. *Yes this is Eddie Stouffer talking.*

[PROSECUTOR]: *That's Eddie Stouffer talking?*

[WITNESS]: *Yes. Uh huh.*

Tobery was a reluctant witness who claimed in her testimony, not to have been present when appellant chased Schell, notwithstanding that she had reported being present when interviewed by the police and had told them what she heard appellant say.

Hearsay, according to MARYLAND RULE 5–801(c), is "a statement, other than one made by the declarant[,] while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MARYLAND RULE 5–802 states that, "except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Except as otherwise provided by MARYLAND

RULE 5–703, a witness may not, under MARYLAND RULE 5–602, "testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

The record revealed that the witness did give testimony both that she heard the threats and that she had no personal knowledge of them. Thereafter, both counsel approached the bench, argued, and the court decided to permit the testimony and concluded that "the jury will have to make a determination." Given Tobery's reluctance, the jury was more than entitled to believe the statement given to the police. We hold that there was no error.

## V

The trial court erred, contends appellant, by giving an aiding and abetting instruction to the jury, because there was no evidence that he encouraged or incited anyone to commit murder or kidnapping and, thus, the instruction was not supported by the evidence. This contention will not detain us long. The most cursory perusal of the record reveals an abundance of evidence to support the instruction based on appellant's belligerent, provocative, and inciteful behavior preceding and during the fatal attack on Jeffrey Fiddler.

Appellant also asserts that it was error for the court to refuse to give an instruction to the jury concerning the credibility of a witness who, in return for her cooperation, had received $200 for her rent from the investigating officers, thus generating the issue of whether this payment affected her credibility and that the instruction given did not adequately cover the issue.

At the request of any party, the court shall, pursuant to MARYLAND RULE 4–325(c), instruct the jury as to the applicable law and the extent to which the instructions are binding. The main purpose of jury instructions is to aid the jury in clearly understanding the case, to provide them with guidance for their deliberations, and to help them arrive at a

correct verdict. *Chambers v. State,* 337 Md. 44, 48, 650 A.2d 727 (1994). In a criminal trial, it is the responsibility of the judge, when requested, to give an advisory instruction on every essential point of law supported by the evidence. *King v. State,* 36 Md.App. 124, 135, 373 A.2d 292, *cert. denied,* 281 Md. 740 (1977).

The instruction regarding the rent payment requested by appellant was a "witness promised leniency" instruction, wherein the court was asked to instruct the jury that they "may consider the testimony of a witness who testifies for the State as a result of a financial benefit. However, [they] should consider such testimony with caution, because the testimony may have been colored by a desire to gain a financial benefit by testifying against [appellant]." The court denied appellant's request.

The requested instruction constituted a correct statement of law. It was not applicable under the facts and circumstances of the case, however, because there was no showing that any witness testified for the State "as a result of financial gain." Appellant was able to elicit evidence that, *at the time* of the witness's statement, she was told she would receive the payment. There was no showing, however, that the witness was promised any financial benefit before the statement was made, nor was there evidence of a *quid pro quo.* The court's general instructions as to the credibility of a witness, in our view, fairly and adequately address those issues that were supported by the evidence.

## VI

■ Appellant suggests that it was error for the court to deny his suggestion of removal, based on extensive pre-trial publicity. Offered in support of his suggestion were newspaper articles that described the case and the trial of co-defendant Burral, in which statements implicating appellant were made. Although the court agreed that one article dated March 14, 1996 was prejudicial to appellant, the court nevertheless denied the motion. Appellant avers that the amount of

pre-trial publicity, coupled with the statements indicating that appellant stabbed the victim, made *voir dire* an inadequate protection of appellant's rights to a fair trial and an unbiased jury.

Removal of a non-capital case in the circuit court is prescribed by RULE 4–254(b):

> When a defendant is charged with an offense for which the maximum penalty is not death and either party files a suggestion under oath that the party cannot have a fair and impartial trial in the court in which the action is pending, the court shall order that the action be transferred for trial to another court having jurisdiction only if it is satisfied that the suggestion is true or that there is reasonable ground for it. . . .

Such removal rests within the sound discretion of the trial judge. *Smith v. State,* 51 Md.App. 408, 415, 443 A.2d 985, *cert. denied,* 293 Md. 618 (1982). On appeal, we will review the trial court's decision to determine whether there has been an abuse of discretion. *Mason v. State,* 12 Md.App. 655, 678, 280 A.2d 753, *cert. denied,* 263 Md. 717 (1971). Absent a showing of abuse of discretion, the decision will not be reversed. *Garland v. State,* 34 Md.App. 258, 260, 367 A.2d 30 (1976).

Usually, despite pre-trial publicity, *voir dire* examination is a sufficient mechanism to insure that a defendant obtains a fair and impartial trial. *Simms v. State,* 49 Md.App. 515, 519, 433 A.2d 1199 (1981). The appellant has the burden of showing that he or she had been prejudiced by adverse publicity and that the *voir dire* examination of the prospective jurors, available to him or her, would not be adequate to assure him or her a fair and impartial trial. *Waine v. State,* 37 Md.App. 222, 227, 377 A.2d 509 (1977). In order to meet the burden, the defendant must show that the newspaper article is prejudicial, that a juror has read the prejudicial article, and that the juror's decision at the trial was influenced by that article. *Id.* The burden of proof may be satisfied if, during *venire,* "each venire[person] empaneled indicates that

he [or she] has not formed an opinion of [the] defendant's guilt or innocence as a result of the pretrial publicity or that the pretrial publicity would not in any way derogate from his [or her] ability to give the defendant a fair and impartial trial...." *Smith,* 51 Md.App. at 416, 443 A.2d 985.

At trial, appellant argued that there had been publicity of the trial and the murder and that more publicity was anticipated. Appellant was most aggrieved by two articles from the *Morning Herald,* a widely-read newspaper in the area, which he feared would taint the jury pool. Appellant conceded that he could not prove that a juror had read the articles, but argued that there was a "great potential" for a juror to do so and to read other articles that would be prejudicial to him.

The court, in denying the Motion for Removal, concluded that there was no showing of the need for a change of venue. The court found that one statement in one of the articles would be prejudicial to appellant; however, it held that there was no showing that a proper *voir dire* of prospective jurors, at the time of trial, would not eliminate "any connection between the prospective juror and the reading of that particular article or other articles...." The court further stated that the motion would be a continuing motion so that the defense would not be precluded from raising it again, depending on future publicity that might occur in the trials of the co-defendants.

We believe when the hearing on the Suggestion for Removal was held, there was no showing that *voir dire* examination of the prospective jurors would not be adequate to assure appellant a fair trial. The court granted a continuing motion that, according to the record, was never renewed. During *voir dire,* no juror said that, as a result of what he or she had heard or seen in the media, he or she would be unable to render a fair and impartial verdict, based solely on the evidence presented at trial.

## VII

Appellant claims that the court erred by withholding, for some time, information from appellant concerning the

indirect and improper contacting of a juror by the victim's father. Appellant maintains that there was no reason for the court to have waited until all the testimony had been presented before advising appellant of the occurrence and allowing appellant to move to strike the juror. Instead, appellant argues, had the court taken immediate action, as required by MARYLAND RULE 4–326(c), it would have avoided the potential for the communication of such occurrence to be made to the other jurors, as well the appearance of unfairness resulting from the juror's belated dismissal. The State argues that appellant did not raise this issue below and, as appellant apparently agreed with the course of action below, should not be addressed on appeal.

RULE 4–326(c) provides:

The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

 Section (c) of the RULE requires full notification of the contents of a jury communication so that both parties can have input into the response to the jury. *Allen v. State,* 77 Md.App. 537, 545, 551 A.2d 156 (1989), *cert. denied,* 320 Md. 15, 575 A.2d 742 (1990). Even when a judge's communication with the jury is in violation of section (c) of the RULE, the error is harmless when it is determined that the error in no way influenced the verdict. *Smith v. State,* 66 Md.App. 603, 624, 505 A.2d 564, *cert. denied,* 306 Md. 371, 509 A.2d 134 (1986).

On November 1, 1996, four days after the beginning of the trial, the judge advised both counsel that, at the beginning of the week, after the jury had been chosen and after some of the evidence had been submitted, Juror 59 came to him and told him that he had been indirectly contacted, during the trial, by Fiddler's father. During *voir dire,* Juror 59 had said that Fiddler's father was an acquaintance—a friend of a friend.

The juror had also answered that, if Fiddler's father does testify in this case, he would not give his testimony any greater or lesser weight and, his knowledge of Fiddler's father would not affect his ability to render a fair and impartial decision based solely upon the evidence presented and the instructions by the court.

The judge explained that, when Juror 59 came to him, the juror indicated that Fiddler's father had contacted a mutual acquaintance, who then telephoned the juror's wife, who then spoke to the juror about the concern of Fiddler's father that, if their relationship was found to be closer, it may give rise to a mistrial. At that time, the judge asked the juror if he felt, in any way, compromised by the communication—whether "he felt pressured by it or felt that his objectivity was compromised. The juror told the judge that he did not think that his objectivity was compromised and that he would be fair and objective."

The trial court clearly violated Rule 4–326(c) when he met with the juror and questioned the juror without first notifying appellant and the State. We also hold that appellant did not waive his right to be notified, pursuant to the RULE, before the court responded, particularly since appellant did not find out until sometime later.

The trial court advised appellant that he could still ask the court to remove the juror, but it would be within the court's discretion. At that point, defense counsel questioned the juror, revealing that the juror did not discuss with any of the other jurors his relationship or association with the Fiddler family, or the conversation with his wife in which he related the concerns of Fiddler's father. Thereafter, the court specifically stated that there was no evidence of any jury taint. Appellant agreed and did not take exception. When appellant asked that the juror be removed and replaced with the alternate juror, the court did so.

Based on the juror's responses to appellant's questions and the fact that appellant, on the record, agreed with the court that there was no jury taint, we are convinced that the court's

failure to comply with RULE 4–326(c) in no way influenced the verdict. The error was harmless.

JUDGMENT OF THE CIRCUIT COURT FOR WASH-INGTON COUNTY REVERSED AS TO FELONY MURDER; CASE REMANDED FOR FURTHER PRO-CEEDINGS[5] CONSISTENT WITH THIS OPINION; JUDGMENT AFFIRMED AS TO KIDNAPPING.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY WASHINGTON COUNTY.

---

5. It appearing that the jury did not consider second degree murder because of its verdict as to felony murder, appellant, under these circumstances, could be tried on retrial for murder in the second degree.